Ronald R. HUTCHINSON, Plaintiff,

v.

William PROXMIRE and Morton Schwartz, Defendants.

No. 76–C–257.

United States District Court,
W. D. Wisconsin.

April 22, 1977.

Michael E. Cavanaugh, Fraser, Trebilcock, Davis & Foster, Lansing, Mich., Carroll Metzner, Madison, Wis., for plaintiff.

Bradway A. Liddle, Jr., Boardman, Suhr, Curry & Field, Madison, Wis., Alan Raywid, Cole, Zylstra & Raywid, Washington, D.C., for defendants.

## MEMORANDUM

LEIGHTON, District Judge, Sitting by Designation.

### I.

This is a suit by a research scientist against a United States Senator, and one of his administrative assistants, seeking eight million dollars in damages for alleged slander, libel, malicious interference with contractual relations, malicious conduct or conduct with grossly negligent disregard for the truth, invasion of rights to privacy, and intentional infliction of emotional anguish. Jurisdiction is invoked under 28 U.S.C. § 1332(a)(1). When this suit was filed the presiding district judge recused himself, and this court was appointed to sit by designation.

Thereafter, the United States Senator moved, in the alternative, for summary judgment. Therefore, the question to be

decided is whether the motion, pleadings, depositions, exhibits, and affidavits disclose there is no genuine issue of material fact and that movant is entitled to judgment as a matter of law. However, to answer this question, this court must resolve three issues. 1. Whether the investigative activities of the United States Senator in connection with his duties as a member of Senate subcommittees were privileged. 2. Whether a press release issued by the United States Senate Service Department and containing the substance of a Senate floor speech by the United States Senator was privileged under the speech or debate clause of the United States constitution. 3. Whether the statements made by the United States Senator to his constituents and in a television appearance were libelous or defamatory. The material facts are as follows.[1]

## II.

The plaintiff, Dr. Ronald R. Hutchinson, is a research scientist, president of the Foundation for Behavioral Research, a nonprofit organization, former director of research at Kalamazoo State Hospital, Fort Custer State Home, and former adjunct associate professor of psychology at Western Michigan University. From 1966 to 1975, he directed research projects under federal grants from the National Aeronautics and Space Administration (NASA), the National Institute for Mental Health (NIMH), the National Institute for Drug Abuse (NIDA), the National Science Foundation (NSF), and the Office of Naval Research (ONR). These projects were investigations into various aspects of animal and human aggression.

Defendant William Proxmire is the senior United States Senator from Wisconsin. Among his congressional duties is service on subcommittees of the Senate Committee on Appropriations which have jurisdiction and review of budget and appropriations for ONR, NASA, NSF, NIDA, and NIMH. As a member of these subcommittees, he votes on appropriations for government obligations and makes recommendations regarding expenditures. Defendant Morton Schwartz is Senator Proxmire's administrative assistant in legislative matters. His duties include research into efficiency in domestic government spending so that he can make recommendations to his superiors on the desirability of particular appropriations.

Early in 1975, Senator Proxmire directed his staff to gather information on wasteful government spending and provide him with at least one example each month so he could dramatize it, call it to the attention of his colleagues, and thus discourage it. To this end, while speaking on the Senate floor in March, 1975, he established what he called the "Golden Fleece of the Month Award," a program through which he made monthly announcements of wasteful government spending identified by his staff. These announcements were routinely accompanied by a press release publicizing his selection for the award.

The Senate Service Department, under the Senate Sergeant-at-Arms, duplicates and distributes senatorial press releases after reviewing them for conformity with Senate regulations governing use of the mailing frank. Senator Proxmire's office routinely supplies the Service Department with a copy of a proposed release and a list of distributees composed at the Senator's direction with the view toward conveying information to his constituents, to interested segments of the news media, and his colleagues, either directly or through their constituents. Senator Proxmire established and approved the procedure by which his news releases were sent to the Senate Service Department for duplication and distribution.

1. This court acknowledges the invaluable assistance of Ms. Emily Nicklin, a third year student at the University of Chicago Law School, who did the underlying research, analysis of the cases, and the preliminary papers for this Memorandum. The caliber of her work reflects the high standards that characterize American legal education and the ability of the young men and women who are preparing to enter our profession.

In March 1975, Mr. Schwartz learned of Dr. Hutchinson's research from Dr. D. Greenburg, editor of a social science publication who had read of plaintiff's work in NTIS, a weekly abstract of government studies and publications. The NTIS abstract referred to two publications by NASA giving details of Dr. Hutchinson's research, both of which Mr. Schwartz subsequently obtained by mail from NASA's Congressional Liaison Officer, Mr. William Allen. The NASA publications cited other research conducted by plaintiff with grants from ONR, NSF, and the Michigan State Department of Mental Health. Mr. Schwartz contacted ONR, and NSF seeking information concerning this research. He spoke with Dr. Robert Woodward of ONR and Mr. Richard Wilson, Congressional Liaison Officer for NSF, inquiring into their reasons for supporting Dr. Hutchinson's projects. At all times, he identified himself as a member of Senator Proxmire's staff. Mr. Schwartz' review of the documents he obtained uncovered one grant to the plaintiff by NIMH, and the additional information that NIMH had rejected all but one 1962 research application Dr. Hutchinson had made to that agency. Having decided that the federal fundings of plaintiff's research constituted a potential "Golden Fleece of the Month Award," Mr. Schwartz spent approximately forty hours over a four-week period reviewing documents and preparing a draft of his findings. During this time, he contacted various state and federal agencies to inquire about the structure of the fundings and to determine their justification.

On or about April 11, 1975, defendant Schwartz telephoned NIMH, and was informed by Mr. Joseph Bracket that other than an expired 1962 grant, plaintiff's research had not been funded by that agency. After this inquiry, Dr. Hutchinson received from NIMH a $11,554 three-year grant

commencing on June 1, 1975. Three days later, Mr. Schwartz made telephone calls to various agencies. He contacted the Michigan State Department of Mental Health to inquire about the structure of plaintiff's state fundings. He telephoned NIDA where he was informed that it did not fund any of plaintiff's projects.[2] He telephoned Mr. Fred Stollnitz of NSF and discussed the possibility of that agency receiving a Golden Fleece of the Month Award for its part in the funding of plaintiff's research. Mr. Stollnitz' telephone log of the conversation reveals that Mr. Schwartz criticized the NSF funding, stating that plaintiff's research was obvious and duplicatively funded by ONR; and that NIMH had not granted plaintiff any funds. On April 15, Mr. Schwartz telephoned Mr. Stollnitz to inform him that NSF definitely would receive the award and made comments about what he called Dr. Hutchinson's "grantsmanship." This having been done, a draft of the "Golden Fleece of the Month Award" for April 1975 was prepared and submitted for review by Senator Proxmire and Mr. Howard Shuman, another of his administrative assistants. After some editing, the award draft was finalized and approved. A copy of the news release concerning the award was sent to the Senate Service Department by Mr. Shuman on April 15 for release on the morning of April 18, 1975.[3]

On or about April 15, Mr. Schwartz telephoned Dr. Hutchinson, told him of the planned "Golden Fleece Award" and read him the text of the press release. Plaintiff objected that he thought it did not fairly evaluate his work and that his name was misspelled. As was his custom, Senator Proxmire made the award the subject of a Senate floor speech in which he stated that NSF, ONR, and NASA had spent:

---

**2.** Since the "Golden Fleece Award" was given to agencies funding plaintiff's research, he has received at least three federal grants: from NASA for one year commencing February 1, 1976, in the sum of $25,000; from NIDA for six months commencing May 30, 1975, in the sum

of $54,800; and from NIMH for three years commencing June 1, 1975, in the sum of $11,-554.

**3.** The release is set out in full as Appendix A to this Memorandum.

"almost $500,000 [4] in the last seven years to determine under what condition rats, monkeys, and humans bite and clench their jaws. From the findings of these studies, it is clear that the government paid a half a million dollars to find out that anger, stopping smoking, and loud noises produce jaw clenching in people . . .. All this money went to Dr. Roland [sic] R. Hutchinson of Kalamazoo State Hospital in Michigan. . . . Dr. Hutchinson's studies should make the taxpayer as well as his monkeys grind their teeth. In fact, the good doctor has made a fortune from his monkeys and in the process made a monkey out of the American taxpayer. . . . In view of the transparent worthlessness of Hutchinson's studies . . . it is time we put a stop to the bite Hutchinson and the bureaucrats who fund him have been taking out of the taxpayer."

In the next newsletter he mailed to his constituents following the release, Senator Proxmire told them of the April award. The news item was in the following language:

### ROMANTIC LOVE STUDIED

Each month I have decided to offer a "golden fleece" award to the organization or person who has most utterly wasted your tax dollars.

Last month's award went to the National Science Foundation for a study of why people fall in love. For $84,000 the researchers were supposed to find out how people grow dependent upon each other in what they called "romantic love."

Not only is this a question that cannot be answered, like what is infinity, I'm not sure we want an answer. There should be some mysteries in life.

### A BITE OUT OF YOUR POCKETBOOK

This month the award is shared jointly by the National Science Foundation, National Aeronautics and Space Administration and the Office of Naval Research. These three organizations have put up $500,000

of your tax money to reach the astounding conclusion that people and monkeys clench their jaws when angry or forced to stop smoking or confronted with loud noise.

In seven years of work by Dr. Ronald R. Hutchinson of Michigan, your money was used to discover that people get angry when they feel cheated and they tend to clench their jaws or even scream and kick. Did you know that? Did you know that monkeys become angry when they are given electric shocks? Or that drunk monkeys do not react as quickly as sober monkeys? That's what your taxes paid for!

Dr. Hutchinson has received one grant after another from various federal bureaucracies to study these earth shaking problems. He has examined crayfish, wasps, boa constrictors, turtles, alligators, opossums, foxes, pigeons, rats, monkeys and humans to discover under what circumstances they show signs of being angry.

### TESTS ON ANIMALS

He has "stimulated" the animals by using physical blows, electric tail shocks, intense heat, brain probing, air blasts, foot shocks and loud noises. He has influenced them with morphine, tranquilizers, food, alcohol, caffeine and in the case of humans, with money.

He graduated from animals to humans in 1970. That's when he began to conclude that humans bite and clench their jaws under stress. And that when they feel cheated, they react by screaming and kicking on occasions.

These studies are continuing and several new proposals, if accepted, will mean another $150,000. for this program.

If this use of your tax money makes you want to kick and scream or clench your jaws, then join the club. The good doctor has made a monkey out of the federal bureaucrats.

---

**4.** There are various estimates of how much federal money plaintiff actually received. Senator Proxmire states that plaintiff received $910,500; plaintiff says that the sum is $820,-500.

I've told these government agencies it's time to get out of this "monkey business" and put an end to worthless studies be they scientific or social.

If you have any suggestions for my next "golden fleece" award, please write to me in Washington.

On at least one other occasion, Senator Proxmire mentioned plaintiff by name to his constituents and commented on what he thought was useless research at the expense of taxpayers. And on the same subject, he made some unspecified statements to a District of Columbia reporting firm, contributed to or authored an article in a popular publication called "Human Events Magazine" and gave an interview to "Behavior Today," a journal that publishes articles on subjects within the spectrum of the behavioral sciences. In the meantime, either Senator Proxmire personally, or his assistant Mr. Schwartz, made follow-up inquiries of federal and state agencies concerning their reaction to the "April Golden Fleece of the Month Award".

Then on November 24, 1975, Senator Proxmire appeared on the Mike Douglas Show, a nationally televised interview program, and described his "Golden Fleece of the Month Award[s]." In response to questions, he gave three examples, and without naming him, alluded to Dr. Hutchinson's research, saying that one of the awards had been for:

". . . a study that cost $500,000 to find out why people, rats and monkeys clench their jaws. They found out they clench their jaws when they were angry, when they were prodded by sticks, when they were hungry, and they didn't clench their jaws as much if they had been drinking."

### III.

The complaint that began this suit, originally in three counts with a fourth added by amendment, attaches the April 18, 1975 press release as an exhibit and alleges it contained untrue statements and omitted others so that the release incorrectly or falsely summarized studies with the result that Senator Proxmire, his agents and employees libeled, slandered and defamed plaintiff by implying that he improperly or illegally profited personally from his governmental research grants; that defendants' telephoning of various federal agencies and attempting to persuade or pressure them to terminate existing grants or contracts for research, prejudiced and prevented plaintiff from obtaining other grants or contracts from federal agencies in the future; that Mr. Schwartz in contacting the federal agencies involved identified himself as Senator Proxmire's staff member and uttered or published slanderous, libelous and defamatory statements which were false regarding plaintiff and threatened or implied to these agencies that if they continued funding of plaintiff's research they would receive Senator Proxmire's "Golden Fleece of the Month Award;" that as a result of defendants' actions, plaintiff lost research funding from various federal agencies, lost the respect of his profession, was subjected to humiliation, held up to public scorn, suffered extreme mental anguish, injury to his feelings, physical illness and pain to his person, accompanied by loss of income and ability to earn money in the future; and that defendants' conduct intentionally violated and infringed plaintiff's right to privacy, his right to peace of mind and tranquility, for which conduct plaintiff seeks judgment against defendants, jointly and severally, in the sum of $8,000,000.

Senator Proxmire's alternative motion for summary judgment concedes as true the issuance of the press release, his investigative activities and those of his administrative assistant, the news letters to constituents containing statements about Dr. Hutchinson, and the appearance on the Mike Douglas television show accompanied by the statement concerning the "Golden Fleece Award" for April 1975. The Senator, however, insists that summary judgment in his favor must be entered because the alleged misconduct was legitimate legislative activity and accordingly absolutely privileged by virtue of the speech or debate clause of the United States Constitution,

**1320**

article I, section 6. He argues that the conduct falls within the investigative or informing functions of Congress, and was related to public contracting and expenditures which are at the heart of congressional business. He insists that his statements and criticisms concerning the use of public funds were privileged under the free speech clause of the First Amendment to the United States constitution. He says that (1) Dr. Hutchinson, as a recipient of public funds, was and is both a public official and a public figure; and (2) there is no factual basis to support a judgment for the plaintiff in this case because (a) his statements accurately and truthfully reported the public contracting involved; (b) the record demonstrates an absence of malice; that is, knowledge of falsity or reckless disregard of the truth; (c) during his television appearance he did not make any statements that constituted actionable libel, defamation or slander; and (d) Mr. Schwartz' communications with government officials administering public funds were privileged. The motion, contention and argument are supported by a well-documented brief, affidavits, 72 exhibits and references to depositions.

Dr. Hutchinson meets this motion with counter-affidavits, 96 exhibits, and a well-written brief containing two arguments that raise what is claimed to be material issues of fact which can only be resolved by a trial. The counter-affidavits are those of fellow scientists familiar with Dr. Hutchinson's work, government evaluations of his research, newspaper articles about the plaintiff, and a number of scientific papers authored by him. From this, he argues that the conduct of Senator Proxmire and his administrative assistant was not legitimate legislative activity and therefore not privileged under the speech or debate clause. Plaintiff declares that his complaint is not directed at any speech on the floor of the Senate; it is at the libel by republication contained in the press release of April 18, 1975, that contained in newsletters to the Senator's constituents, the allegedly defamatory statement Senator Proxmire made during the Mike Douglas

Show, the comments concerning plaintiff to news reporters, and communications with various federal agencies and their staffs. Dr. Hutchinson argues for a restrictive application of the speech or debate clause which, he insists, is mandated by decisions of the United States Supreme Court in a number of its recent pronouncements on the subject.

### IV.

#### A.

■ The speech or debate clause of the federal constitution provides, in pertinent part, that ". . . Senators and Representatives . . . for any Speech or Debate in either House, . . . shall not be questioned in any other Place." U.S.Const. art. I, sec. 6. In *Kilbourn v. Thompson*, 103 U.S. 168, 26 L.Ed. 377 (1880), for the first time, the Supreme Court dealt with a challenge to the immunity conferred by the clause. There, a congressional committee witness who refused to deliver certain documents to the committee was ordered taken into custody. He brought suit for false imprisonment against the House Sergeant-at-Arms and members of the House of Representatives who had voted for the order. It was held that in ordering the witness' imprisonment, the House had exceeded its authority; but that the speech or debate clause precluded imposition of liability on the congressmen who voted for the arrest, even though they had violated the witness' constitutional rights. The Court said:

"It would be a narrow view of the constitutional provision to limit it to words spoken in debate. The reason of the rule is as forcible in its application to written reports presented in that body by its committees, to resolutions offered, which, though in writing, must be reproduced in speech, and to the act of voting. . . . In short, to things generally done in a session of the House by one of its members in relation to the business before it." 103 U.S. at 204.

Thus, actions within the legislative role were held to be within the ambit of the

privilege. And consistent with this holding, the Supreme Court has reaffirmed that once it is determined a member of Congress is acting within a "legitimate legislative sphere," the speech or debate clause is an absolute bar to interference. *Eastland v. United States Servicemen's Fund*, 421 U.S. 491, 503, 95 S.Ct. 1813, 44 L.Ed.2d 324 (1975), citing *Doe v. McMillan*, 412 U.S. 306, 314, 93 S.Ct. 2018, 36 L.Ed.2d 912 (1973). The standard for invoking congressional immunity under article I, section 6 of the Constitution is the standard of legitimate legislative activity. In the event of a suit, once it is determined that the conduct complained of meets that standard, the action must be dismissed. The Court has said:

> "[L]egislators acting within the sphere of legitimate legislative activity 'should be protected not only from the consequences of litigation's results but also from the burden of defending themselves.' *Dombrowski v. Eastland*, [387 U.S. 82, 85, 87 S.Ct. 1425, 1427, 18 L.Ed.2d 577 (1967)] . . . . [A] private civil action, whether for an injunction or damages, creates a distraction and forces Members to divert their time, energy, and attention from their legislative tasks to defend the litigation. Private civil actions also may be used to delay and disrupt the legislative function. Moreover, whether a criminal action is instituted by the Executive Branch, or a civil action is brought by private parties, judicial power is still brought to bear on Members of Congress and legislative independence is imperiled." *Eastland v. United States Servicemen's Fund*, 421 U.S. 491, 503, 95 S.Ct. 1813, 1821.

Although it is certain that legitimate legislative activity is within the privilege, considerable confusion exists as to what constitutes legitimate legislative activity because there are expansive dicta and a multiplicity of views in the cases examining various conduct alleged to be protected by the clause. Although the Supreme Court has always insisted that the clause must be read "broadly to effectuate its purpose," *United States v. Johnson*, 383 U.S. 169, 180, 86 S.Ct. 749, 15 L.Ed.2d 681 (1966), recent cases appear to adopt a restrictive view of what is legitimate legislative activity.

The conduct of Senator Proxmire and his administrative assistant can be divided into phases for the purpose of determining applicability of the speech or debate clause:

(1) investigation into federal funding of Dr. Hutchinson's research;

(2) delivery of a speech on the Senate floor by the Senator; and issuance of a press release reciting the facts and content of the Senate speech;

(3) follow-up investigation by the Senator's staff and by him at appropriation hearings; and

(4) the Senator's statement on the Mike Douglas Show, his newsletter to constituents, and his other comments about the plaintiff.

As to the investigation into federal funding of Dr. Hutchinson's research, the Supreme Court has always recognized the authority of Congress to investigate. In *Watkins v. United States*, 354 U.S. 178, 77 S.Ct. 1173, 1 L.Ed.2d 1273 (1957), dealing with the appeal from a conviction for contempt of Congress, the Court stated:

> "The power of the Congress to conduct investigations is inherent in the legislative process. That power is broad. . . . It comprehends probes into departments of the Federal Government to expose corruption, inefficiency or waste. But, broad as is this power of inquiry, it is not unlimited. There is no general authority to expose the private affairs of individuals without justification in terms of the functions of the Congress. . . . No inquiry is an end in itself; it must be related to, and in furtherance of, a legitimate task of the Congress. Investigations conducted solely for the personal aggrandizement of the investigators or to 'punish' those investigated are indefensible." 354 U.S. at 187, 77 S.Ct. at 1179.

■ In this case, Senator Proxmire serves on several subcommittees of the Senate Committee on Appropriations. These subcommittees review the budgets of the various agencies with which Dr. Hutchinson

has contracted. As a member of these subcommittees, Senator Proxmire votes on appropriations, makes recommendations regarding the distribution of government funds, and concerns himself with their expenditure. Therefore, his inquiries, and those of his administrative assistant, into how American taxpayers' moneys are spent by the agencies over which the subcommittees in question had jurisdiction were privileged as legitimate legislative activity under the *Kilbourn* test of "things generally done in a session of the House by one of its members in relation to the business before it." 103 U.S. at 204. This being the case, the court will turn to the issue whether as to Senator Proxmire, the April 18, 1975 press release was also privileged under the speech or debate clause.

### B.

The most recent Supreme Court pronouncements on the subject of legitimate legislative activity in the context of republication of congressional activity are *Gravel v. United States*, 408 U.S. 606, 92 S.Ct. 2614, 33 L.Ed.2d 583 (1972), and *Doe v. McMillan*, 412 U.S. 306, 93 S.Ct. 2018, 36 L.Ed.2d 912 (1973). These pronouncements have an important bearing on the issue to be resolved.

In *Gravel*, the government sought to subpoena a Senator's aide and compel him to testify before a grand jury investigating the release and republication of certain classified documents, the Pentagon Papers. It appears that Senator Gravel had convened a subcommittee meeting and had read extensively from the classified materials. He then inserted the forty-seven volume study into the Congressional Record and, some weeks later, arranged for its republication by a private printing company. The Senator, as intervenor, moved to quash the subpoena and to require the government to specify the questions it was going to ask his aide, contending that requiring the aide to testify would violate the speech or debate clause. In a six to three decision, the Supreme Court agreed with Senator Gravel, holding that the speech or debate clause extended immunity to both him and his aide with respect to events which occurred in preparation for and conduct of the subcommittee meeting. However, the Court held that there was no immunity with respect to arrangements the Senator had made for private republication of the Papers. With regard to the immunity that extended to the Senator's aid, the Court said,

"[I]t is literally impossible, in view of the complexities of the modern legislative process, with Congress almost constantly in session and matters of legislative concern constantly proliferating, for Members of Congress to perform their legislative tasks without the help of aides and assistants; . . . the day-to-day work of such aides is so critical to the Members' performance that they must be treated as the latter's alter egos; and . . . if they are not so recognized, the central role of the Speech or Debate Clause—to prevent intimidation of legislators by the Executive and accountability before a possibly hostile judiciary [citation omitted]—will inevitably be diminished and frustrated." 408 U.S. at 616–617, 92 S.Ct. at 2623.

The court emphasized that aides are only protected insofar as they "perform or aid in the performance of legislative acts." 408 U.S. at 618, 92 S.Ct. at 2623. Thus, they are protected only to the extent they perform acts which would be privileged were the legislator-superior to perform them.

In holding that the privilege precluded questioning of either the Senator or his aide about the subcommittee meeting, but not about the arrangements for private republication, the Court found that the subcommittee meeting easily met the *Kilbourn* test of acts "generally done in a session of the House by one of its members in relation to the business before it." 408 U.S. at 624, 92 S.Ct. at 2626. The Court assumed that action taken in committee was legitimate legislative activity, without examining its relationship to pending legislation or ordinary committee business. Arrangements for private republication of the Papers were found not to meet the test because they

were unrelated to the legislative process. 408 U.S. 625–26, 92 S.Ct. 2614. The court warned:

> "Legislative acts are not all-encompassing. The heart of the Clause is speech or debate in either House. Insofar as the Clause is construed to reach other matters, they must be an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House." 408 U.S. at 625, 92 S.Ct. at 2627.

Private republication, the Court found, was not central to Senate deliberations; consequently, a grand jury inquiry into arrangements for private republication did not threaten Senate independence by "impermissibly" exposing Senate deliberations to executive influence. 408 U.S. at 625, 92 S.Ct. 2614.

In *Doe v. McMillan*, 412 U.S. 306, 93 S.Ct. 2018, 36 L.Ed.2d 912 (1973), parents of children in the District of Columbia school system brought a class action alleging that the release and publication of a congressional committee report on the District of Columbia school system revealed embarrassing information about individually named children, infringed their right to privacy, damaged their mental and physical health, and harmed their reputations and future careers. The parents sought to enjoin further publication, and recover compensatory and punitive damages. The defendants, among others, included (1) the Chairman and members of the House Committee on the District of Columbia; (2) various committee staff members; and (3) the Superintendent of Documents and the Public Printer.

The District Court dismissed the complaint as to all defendants; the Court of Appeals affirmed; the Supreme Court affirmed in part and reversed in part, holding that the complaint was barred by the speech or debate clause "[i]nsofar as it sought relief from the Congressmen-Committee members, from the Committee staff, from the consultant, or from the investigator, for introducing material at Committee hearings that identified particular individuals, for referring the report that included the material to the Speaker of the House, and for voting for publication of the report." 412 U.S. at 312, 93 S.Ct. at 2024. These acts, and distribution of the report, the Court said, were "legislative acts." 412 U.S. at 312, 93 S.Ct. at 2018. It recognized explicitly that, constitutionally, there was no judicial authority to oversee the judgment of the Committee with respect to the utility or necessity of including the names of particular children in the report. 412 U.S. at 313, 93 S.Ct. 2018.

However, the Court refused to extend the privilege to non-legislator personnel who published the report for the purpose of informing the public about congressional business. Therefore, it found that the Superintendent of Documents and the Public Printer enjoyed no immunity for carrying out the directions given them to publish the report, although Congressmen and their staffs were immune from suit for ordering the publication that went beyond the requirements of the legislative function. In holding liable those who, at the direction of Congress, distributed actionable material to the public, the Court commented:

> "To hold otherwise would be to invite gratuitous injury to citizens for little if any public purpose. We are unwilling to sanction such a result, at least absent more substantial evidence that, in order to perform its legislative function, Congress must not only inform the public about the fundamentals of its business but also must distribute to the public generally materials otherwise actionable under local law." 412 U.S. at 316–17, 93 S.Ct. at 2027.

The "informing function" of Congress was not undermined by the holding, the Court insisted, because congressional materials such as reports are available for inspection by the press and the public. 412 U.S. at 317, 93 S.Ct. 2018.

The dissent in *Gravel* joined the *Doe* majority with Justice Douglas' concurring opinion emphasizing that:

"We all should be painfully aware of the potentially devastating effects of congressional accusations. . . . There can be no question that the resolution authorizing the investigation and study expressed a legitimate legislative purpose. Nevertheless, neither the investigatory nor, indeed, the informing function of Congress authorizes any 'congressional power to expose for the sake of exposure.'" 412 U.S. at 329, 330, 93 S.Ct. at 2033 (citing *Watkins v. United States*, 354 U.S. 178, 200, 77 S.Ct. 1173, 1 L.Ed.2d 1273 (1957).)

Three members of the *Gravel* majority, Chief Justice Burger and Justices Blackmun and Rehnquist, dissented. They argued that the speech or debate clause should be read to cover preparation, content, and publication of any committee report, once it is determined that it was properly authorized by Congress and had a valid legislative purpose. 412 U.S. at 331 *et seq.*, 93 S.Ct. 2018. Therefore, *Doe v. McMillan* suggests a restrictive view of what constitutes legitimate legislative activity in the context of private defamation actions. By distinguishing between the Congressmen and their staff, on the one hand, and the Public Printer and the Superintendent of Documents, on the other, the Court has made it clear that authorizing and requesting distribution of a privileged speech or document may not be made the basis of civil or criminal liability, while distribution by non-legislators may lead to liability because the privilege of the speech or debate clause does not apply.[5]

In the case at bar, Senator Proxmire resists liability for the press release on two grounds, one of which is compatible with *Gravel* and *Doe*. First, he argues that no liability can be imposed upon him for authorizing the release because the subject matter of the statement, appropriations and expenditures, is within his immediate jurisdiction as a member of the various subcommittees on appropriations. Hence, his conduct is absolutely privileged, as were the actions of the subcommittee members in *Doe*. Second, he insists that his authorization of the press release is immune because it is an exercise of the "informing function." Congress has enacted legislation to establish guidelines and mechanisms for distribution of various materials. The franking statute, 39 U.S.C. § 3210 (1970), promotes the "informing function" by authorizing free use of the mails. The statute specifically includes press releases and newsletters ". . . which may deal with such matters as the impact of laws and decisions on State and local governments and individual citizens; reports on public and official actions taken by Members of Congress; and discussions of proposed or pending legislation or governmental actions and the positions of Members of Congress on, and arguments for or against, such matters." 39 U.S.C. § 3210(3)(B) (1970). Moreover, Congress has established an administrative procedure for policing possible abuses of the franking privilege. See 2 U.S.C. § 501 *et seq.* (1970).

█ Lower courts have recognized the legitimacy of the "informing function" as a legislative activity in actions involving alleged abuses of the franking privilege. In *Hoellen v. Annunzio*, 348 F.Supp. 305 (N.D. Ill.1972), *aff'd* 468 F.2d 522 (7th Cir. 1972), *cert. denied*, 412 U.S. 953, 93 S.Ct. 3001, 37 L.Ed.2d 1006 (1973), the district court held

---

5. In other cases, the Court has shown a willingness to impose liability on those who act at the direction of legislators, while protecting the legislators themselves. See, *e. g., Powell v. McCormack*, 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969), where certain House members, the House Sergeant-at-Arms, and the House Doorkeeper were sued for violating constitutional rights; House members held immune under speech or debate clause, Sergeant-at-Arms and Doorkeeper held not immune for carrying out House members' orders; *Dombrowski v. Eastland*, 387 U.S. 82, 87 S.Ct. 1425, 18 L.Ed.2d 577 (1967), where legislators and their counsel accused of participation in conspiracy to violate constitutional rights, legislators held immune under clause, no immunity necessarily extended to their counsel; *Kilbourn v. Thompson* 103 U.S. 168, 26 L.Ed. 377 (1880).

that the use of the frank to send constituents questionnaires which contained the defendant-Congressman's photograph was a legitimate mailing "upon official business" in the exercise of the "informing function." See *Bowie v. Williams*, 351 F.Supp. 628 (E.D.Pa.1972). For these reasons, this court is constrained to agree with Senator Proxmire. The speech or debate clause of the constitution renders him immune from liability to Dr. Hutchinson for his authorization of the press release of April 18, 1975. That press release, in a constitutional sense, was no different than would have been a television or radio broadcast of his speech from the Senate floor.

### C.

The remaining issue is whether Senator Proxmire's statement on the Mike Douglas Show, his newsletter references to Dr. Hutchinson's research and fundings, his comments to news reporters and in interviews either mentioning Dr. Hutchinson by name or alluding to his work, were libelous or defamatory. Resolution of this issue depends on Dr. Hutchinson's position in his community, and the interest of the public in the research projects for which he had received federal funding.

In *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), the Supreme Court held that the First Amendment provides a conditional immunity from liability in libel actions brought by public officials. The Court ruled that to preserve free, uninhibited discussion of public issues, a newspaper could not be held liable for publishing a defamatory falsehood about a public official unless the plaintiff demonstrated with "convincing clarity" that the publication was made with "actual malice;" that is, actual knowledge of falsity or reckless disregard of the truth. 376 U.S. at 279–80, 84 S.Ct. 710. In *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967), the Court extended *New York Times* to actions brought by "public figures," persons who are "intimately involved in the resolution of important public questions or, by reason of

their fame, shape events in areas of concern to society at large." 388 U.S. at 164, 87 S.Ct. at 1996 (Warren, C. J., concurring). The test formulated in *New York Times* represents recognition that freedoms of speech and press are essential to open discussion of public issues, freedoms our founding fathers deemed fundamental for the continued existence of our governmental system. *New York Times v. Sullivan*, 376 U.S. at 270, 84 S.Ct. 710. The test recognizes that:

> "erroneous statement is inevitable in free debate, and that it must be protected if the freedoms of expression are to have the 'breathing space' that they 'need . . . to survive' . . . ." *Id.* at 271–72, 84 S.Ct. at 721.

Soon after this extension, a plurality of the Court held in *Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971), that the *New York Times* test applied whenever the publication concerned matters of general or public interest, without regard to the plaintiff's position in his community. 403 U.S. at 43, 91 S.Ct. 1811. This holding was abandoned in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), where it was decided that a publisher is liable to a public figure "only on clear and convincing proof that the defamatory falsehood was made with knowledge of its falsity or with reckless disregard for the truth." 418 U.S. at 342, 94 S.Ct. at 3008. However, in the case of private individuals, a less demanding standard is constitutionally permissible. At least where the substance of the defamatory statement makes substantial danger to reputation apparent, states may define for themselves the appropriate standard of liability, provided they do not impose liability without fault. 418 U.S. at 347, 348, 94 S.Ct. 2997. However, states may not permit recovery of presumed or punitive damages, at least where liability is not based on a showing of "actual malice" as defined by *New York Times*. *Id.* at 349, 94 S.Ct. 2997.

It is not easy to determine whether a plaintiff is a public figure or a private individual. As one court has wryly ob-

served, "Defining public figures is much like trying to nail a jellyfish to the wall." *Rosanova v. Playboy Enterprises, Inc.*, 411 F.Supp. 440, 443 (S.D.Ga.1976). In a recent decision, *Time, Inc. v. Firestone*, 424 U.S. 448, 96 S.Ct. 958, 965, 47 L.Ed.2d 154 (1976), the Supreme Court held that the plaintiff was not a public figure since she had not assumed any role of "especial prominence in the affairs of society. . . ." *Id.* at 453. The fact that she had held press conferences during a well-publicized divorce proceeding was insufficient to make her a public figure for the purpose of determining the constitutional protection afforded the defendant's report of her divorce.

■ The term "public figure" has been variously defined. In *Gertz*, the Court stated that "[t]hose who, by reason of the notoriety of their achievements or the vigor and success with which they seek the public's attention, are properly classed as public figures". 418 U.S. at 342, 94 S.Ct. at 3008. Designation as a public figure:

". . . may rest on either of two alternative bases. In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues. In either case such persons assume special prominence in the resolution of public questions." *Gertz v. Robert Welch, Inc.*, 418 U.S. at 351, 94 S.Ct. at 3013.

The Court added:

"Absent clear evidence of general fame or notoriety in the community, and pervasive involvement in the affairs of society, an individual should not be deemed a public personality for all aspects of his life. It is preferable to reduce the public-figure question to a more meaningful context by looking to the nature and extent of an individual's participation in the particular controversy giving rise to the defamation." *Id.* at 352, 94 S.Ct. at 3013.

■ Lower court determinations regarding the public figure status of a plaintiff in a defamation action have followed the Court's suggestion and examined the plaintiff's role in the controversy out of which the defamation arises. See, generally, Annot., 75 A.L.R.3d 616 (1977). In *Rosanova v. Playboy Enterprises, Inc.*, 411 F.Supp. 440 (S.D.Ga.1976), the court concluded that the plaintiff was a public figure for purposes of a libel action based on defendant's magazine article identifying him as a "mobster" because over the years he had voluntarily engaged in a course of conduct bound to invite attention and comment through his voluntary contacts with organized crime figures. In *Hotchner v. Castillo-Puche*, 404 F.Supp. 1041 (S.D.N.Y.1975), the plaintiff was found to be a public figure for purposes of a libel action based on defendant's book about Ernest Hemingway. Although the plaintiff's name was not well known in the community, he had successfully published a number of widely distributed works based on his relationship with Hemingway, and was thus found to have injected himself into controversies surrounding the later years of the novelist's life, a matter of considerable public interest. In a number of other cases, and on varying facts, courts in different parts of the country have reached the same conclusion. *Guitar v. Westinghouse Elec. Corp.*, 396 F.Supp. 1042 (S.D.N.Y.1975), aff'd, 538 F.2d 309 (2d Cir. 1976); *Buchanan v. Associated Press*, 398 F.Supp. 1196 (D.D.C.1975); *Fram v. Yellow Cab Co.*, 380 F.Supp. 1314 (W.D.Pa.1974); *Meeropol v. Nizer*, 381 F.Supp. 29 (S.D.N.Y.), pet. denied, 508 F.2d 837 (2d Cir. 1974). The question whether the *New York Times* test applies to a case is one of law. "[I]t is for the trial judge in the first instance to determine whether the proofs show [plaintiff] to be a [public figure or a] 'public official.'" *Rosenblatt v. Baer*, 383 U.S. 75, 88, 86 S.Ct. 669, 677, 15 L.Ed.2d 597 (1966); *Rosanova v. Playboy Enterprises, Inc.*, 411 F.Supp. 440, 444 (S.D.Ga.1976); *Hotchner v. Castillo-Puche*, 404 F.Supp. 1041, 1045 (S.D.N.Y.1975).

Here, Dr. Hutchinson argues that he is not a public figure because he has never

voluntarily exposed himself to extensive public attention, nor assumed any role of special prominence in the affairs of society, nor thrust himself to the forefront of public controversy. He contends that the media coverage of his research before the "Award" was limited to brief articles in largely local newspapers. Moreover, he argues that because the information for these articles was solicited from him by the News and Publications' Department of Western Michigan University which provided him with 'forms' for reporting on his work to the media, he did not initiate media coverage and hence did not invite public attention and comment.

Senator Proxmire contends that in the area of criticism, the merit of publicly-funded studies, plaintiff has sought and acquired a public standing and reputation. He has published widely in the scientific community, claiming more than forty behavioral science articles. Except for the period 1960–61, he has been employed as a research scientist at various public institutions. Since 1966, his achievements, grants and studies have been the subject of media coverage. Defendant argues that this media coverage indicates not only that plaintiff is a public figure but that he solicited that status through press releases and interviews.

Given Dr. Hutchinson's long involvement with publicly-funded research, his active solicitation of federal and state grants, the local press coverage of his research, and the public interest in the expenditure of public funds on the precise activities in which he voluntarily participated, the court concludes that he is a public figure for the purpose of this suit. As he acknowledged in his deposition, "Certainly, any expenditure of public funds is a matter of public interest."

He is also, in the judgment of this court, a public official. See generally Annot., 19 A.L.R.3d 1361 (1968). Although the Supreme Court has never articulated the limits of this classification, Rosenblatt v. Baer, 383 U.S. 75, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966), offers some guidance. There,

the Court held that the New York Times test was applicable to a libel action brought by a former supervisor of a county recreation area who was appointed by and responsible to three county commissioners. The alleged libel had criticized fiscal management under the plaintiff's regime. The Court stated:

"The thrust of New York Times is that when interests in public discussion are particularly strong, as they were in that case, the Constitution limits the protections afforded by the law of defamation. Where a position in government has such apparent importance that the public has an independent interest in the qualifications and performance of the person who holds it, beyond the general public interest in the qualifications and performance of all government employees, . . . the New York Times malice standards apply. . . . The employee's position must be one which would invite public scrutiny and discussion of the person holding it, entirely apart from the scrutiny and discussion occasioned by the particular charges in controversy." Id. at 86, 86–87, fn. 13, 86 S.Ct. at 676.

In Adey v. United Action for Animals, 361 F.Supp. 457 (S.D.N.Y.1973), aff'd, 493 F.2d 1397 (2d Cir.), cert. denied, 419 U.S. 842, 95 S.Ct. 74, 42 L.Ed.2d 70 (1974), the district court found that the plaintiff, a research scientist employed by NASA and involved in planning a space flight for a monkey, was both a public figure and a public official for the purpose of an action based on allegedly defamatory remarks about his treatment of experimental animals. In this case, Dr. Hutchinson held the important public position of director of research at the Kalamazoo State Hospital in Kalamazoo, Michigan; he was dealt with as a responsible public official by the federal agencies that funded his research; and he holds himself out as the president of a not-for-profit corporation that purports to act in the public interest. Therefore, at the times relevant to this controversy he held "a position in government * * * [with] such apparent importance that the public has an inde-

pendent interest in the qualifications and performance of the person who holds it . . . ." *Rosenblatt v. Baer*, 383 U.S. 75, 86, 86 S.Ct. 669, 676.

■■■■ This important fact appears from the affidavits, exhibits, and excerpts from depositions that support the motion for summary judgment; and consequently, the question arises: has Dr. Hutchinson made a sufficient showing that there is a genuine issue of material fact with regard to actual malice on the part of Senator Proxmire; i. e., knowledge on his part of the falsity of what he said, or a reckless disregard by him of the truth, when he made the statements about which complaint is made? The showing of malice may not be presumed but must be proved by the plaintiff. *Time, Inc. v. McLaney*, 406 F.2d 565, 572 (5th Cir.), *cert. denied*, 395 U.S. 922, 89 S.Ct. 1776, 23 L.Ed.2d 239 (1969). A bare allegation of malice, standing alone, is not sufficient to withstand a motion for summary judgment. *Fram v. Yellow Cab Co.*, 380 F.Supp. 1314, 1335 (W.D.Pa.1974); *Goldman v. Time, Inc.*, 336 F.Supp. 133, 138 (N.D.Cal.1971). Rule 56(e) of the Federal Rules of Civil Procedure requires a party opposing a motion for summary judgment to show specific facts, admissible in evidence, which establish that there is a genuine issue for trial. Moreover, under *New York Times*, the standard of proof plaintiff must meet at trial is more than a preponderance of evidence; it is a showing of defendant's actual knowledge of falsity or reckless disregard of the truth by "clear and convincing evidence." *Vandenburg v. Newsweek, Inc.*, 507 F.2d 1024, 1026, 1029 (5th Cir. 1975); see *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80, 84 S.Ct. 710, (1964); *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342, 94 S.Ct. 2997, (1974).

■■■■ "Knowledge of falsity" presumably means just what it says: subjective awareness by the defendant that his statements were false. "Reckless disregard of the truth," on the other hand, has been defined by several Supreme Court decisions to require that the defendant act with a "high degree of awareness of . . .

probable falsity". *Beckley Newspapers Corp. v. Hanks*, 389 U.S. 81, 84, 88 S.Ct. 197, 200, 19 L.Ed.2d 248 (1967); *Garrison v. Louisiana*, 379 U.S. 64, 74, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964). In the leading case of *St. Amant v. Thompson*, 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968), the Court found the "reckless disregard" requirement unsatisfied where the defendant had published defamatory falsehoods about the plaintiff without personal knowledge of the matter published. The Court said:

> ". . . reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. . . . The finder of fact must determine whether the publication was indeed made in good faith. Professions of good faith will be unlikely to prove persuasive . . . where a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call. Nor will they be likely to prevail when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation. Likewise, recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." 390 U.S. at 731, 732, 88 S.Ct. at 1326.

■■■■ Measured by this standard, it is clear that Dr. Hutchinson's allegations of libel and defamation fall short. His arguments that he was subjected to these torts proceed, basically, along these lines: failure to investigate; unfair editing in disregard of the facts before defendants; and republication after plaintiff complained about the press release of April 18, 1975. From *St. Amant*, it is clear that failure to investigate is insufficient to establish reckless disregard of the truth. Moreover, the record shows that Mr. Schwartz, on behalf of Senator Proxmire, spent approximately forty hours over a four week period gathering and re-

viewing agency documents regarding plaintiff and making a draft of his findings. During this time, he contacted various state and federal agencies to verify his findings and to inquire about the justification for the funding in question. Senator Proxmire and his administrative assistant, Howard Shuman, reviewed Mr. Schwartz' findings. Before publishing the release, Schwartz telephoned plaintiff to read him the text of the release and ask him if there were any factual misstatements. Dr. Hutchinson said that the intended release did not fairly evaluate his research, but corrected only a misspelling of his name.

■ The charge now being made of defendants' unfair editing in disregard of the facts before them is also insufficient to establish actual malice. Undoubtedly, editing involves making choices; but selective reporting will not support a finding of reckless disregard of the truth. Summarizing plaintiff's research for the purpose of making some statement about its federal funding will not rise to the level of falsification. In *Time, Inc. v. Pape*, 401 U.S. 279, 91 S.Ct. 633, 28 L.Ed.2d 45 (1971), a magazine reported as a charge by the United States Commission on Civil Rights an incident of police brutality which the Commission itself, in its report, characterized as the allegations of a civil rights complaint. Notwithstanding the fact that the reporters themselves were aware that the Commission attributed its account of the incident to a court complaint, the Court held that the failure to include such a secondary attribution in the article was not "'falsification' sufficient in itself to sustain a jury finding of 'actual malice'." 401 U.S. at 289, 91 S.Ct. at 639. It would appear that an error in interpretation of ambiguous documents, such as the conglomeration of plaintiff's grants and publications, through the adoption of one of several rational alternatives, is insufficient to create a jury issue.

■ Moreover, Dr. Hutchinson's claim with regard to unfair editing and summarization of his research is not buttressed by Senator Proxmire's characterizations of the research as "nonsense" and "transparently

worthless" or the suggestion that the news release gives the false impression of $500,-000 having been paid personally to plaintiff, and that he was making a fortune from government money. In *Greenbelt Cooperative Publishing Ass'n, Inc. v. Bresler*, 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970), plaintiff was a land developer who was seeking zoning variances from a town which was in turn attempting to buy land from him. He used his position as seller to strengthen his position in requesting the variances. Defendant-newspaper had reported third-persons' characterizations of plaintiff's conduct as "blackmail." The Court held that, as a matter of constitutional law, the use of the word "blackmail" in this context was not libelous:

"[E]ven the most careless reader must have perceived that the word was no more than rhetorical hyperbole, a vigorous epithet used by those who considered [plaintiff's] negotiating position extremely unreasonable." 398 U.S. at 14, 90 S.Ct. at 1542.

Here, too, it would appear that Senator Proxmire's statement, "the good doctor has made a fortune from his monkeys and in the process made a monkey out of the American taxpayer" is, at worse, no more than rhetorical hyperbole. Compare *Time, Inc. v. Johnston*, 448 F.2d 378 (4th Cir. 1971).

■ Defendant's republication of the allegedly defamatory remarks after plaintiff complained about the release also appears insufficient to raise a jury issue of actual malice. Defendants Proxmire and Schwartz believed the statements to be true when made and still believe them to be true. Nothing in either defendant's affidavit or deposition indicates that they ever entertained any doubt as to the truth of their statements.

■ The constitutional privilege of *New York Times* mandates summary judgment once it becomes clear that a plaintiff cannot establish the actual malice required for recovery in defamation actions of this nature. *Meeropol v. Nizer*, 381 F.Supp. 29, 32, fn. 1 (S.D.N.Y.), *pet. denied*, 508 F.2d

837 (2d Cir. 1974). However, " '[o]n a motion for a summary judgment the burden of establishing the non-existence of any genuine issue of fact is upon the moving party, *all doubts are resolved against him,* and his supporting affidavits and depositions, if any, are carefully scrutinized by the court'." *Rose v. Bridgport Brass Co.,* 487 F.2d 804, 808 (7th Cir. 1973) [citations omitted]. But the court has a special responsibility here to determine if there is any genuine dispute because of the danger that speech may be chilled by the mere fact of litigation. *Guam Fed. of Teachers, Local 1581, A. F. T. v. Ysrael,* 492 F.2d 438 (9th Cir.), *cert. denied,* 419 U.S. 872, 95 S.Ct. 132, 42 L.Ed.2d 111 (1974); *Oliver v. Village Voice, Inc.,* 417 F.Supp. 235, 237 (S.D.N.Y.1976). The court must make a threshold determination, before trial, whether there has been a showing of actual malice. *Bon Air Hotel v. Time, Inc.,* 426 F.2d 858, 864 (5th Cir. 1970); *Wasserman v. Time, Inc.,* 138 U.S.App.D.C. 7, 424 F.2d 920, 922 (1970) (Wright, J. concurring), *cert. denied,* 398 U.S. 340, 90 S.Ct. 1844, 26 L.Ed.2d 273 (1970). "[I]n making this determination, the granting of summary judgment may well be the 'rule' rather than the 'exception'." *Oliver v. Village Voice, Inc.,* 417 F.Supp. 235, 237 (S.D.N.Y. 1976); *Guitar v. Westinghouse Elec. Corp.,* 396 F.Supp. 1042, 1053 (S.D.N.Y.1975), *aff'd,* 538 F.2d 309 (2d Cir. 1976); see also, *Perry v. Columbia Broadcasting System, Inc.,* 499 F.2d 797 (7th Cir.), *cert. denied,* 419 U.S. 883, 95 S.Ct. 150, 42 L.Ed.2d 123 (1974); *Cervantes v. Time, Inc.,* 464 F.2d 986 (8th Cir. 1972), *cert. denied,* 409 U.S. 1125, 93 S.Ct. 939, 35 L.Ed.2d 257 (1973); *Washington Post Co. v. Keogh,* 125 U.S. App.D.C. 32, 365 F.2d 965, 968 (1966), *cert. denied,* 385 U.S. 1011, 87 S.Ct. 708, 17 L.Ed.2d 548 (1967).

 But even if for the purpose of this suit it is found that Dr. Hutchinson is a private person so that First Amendment protections do not extend to Senator Proxmire and his administrative assistants, relevant state law dictates the grant of summary judgment. In a diversity action, under the doctrine of *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), a federal court must apply the conflict of laws doctrine of the state in which it sits. *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Thus, sitting in Wisconsin where the suit is filed, this court must look to the choice of law principles of this jurisdiction to determine what state law to apply. In *Wilcox v. Wilcox,* 26 Wis.2d 617, 133 N.W.2d 408 (1965), the Wisconsin Supreme Court abandoned the *lex loci delicti* approach to choice of law problems in tort cases and adopted the general approach of *Babcock v. Jackson,* 12 N.Y.2d 473, 240 N.Y.S.2d 743, 191 N.E.2d 279 (1963). It has since elaborated on the new method of analysis and adopted "choice-influencing" considerations which are "Predictability of results, Maintenance of interstate and international order, Simplification of the judicial task, Advancement of the forum's governmental interests, Application of the better rule of law." *Conklin v. Horner,* 38 Wis.2d 468, 478, 157 N.W.2d 579, 583 (1968); accord, *Heath v. Zellmer,* 35 Wis.2d 578, 151 N.W.2d 664 (1967). It is not certain what law Wisconsin would apply in this case, using these "choice-influencing" considerations; but it appears the option is logically limited to the law of two jurisdictions, that of the District of Columbia, the place where defendants work and their allegedly wrongful conduct originated, or of Michigan, the plaintiff's domicile, where the injury presumably had effect. For application of the relevant law, the conduct consisted of (1) the April 18, 1975 press release and the newsletters to constituents; (2) the Mike Douglas Show appearance and the other alleged defamations, some of them unspecified. However, under the law of either jurisdiction, Dr. Hutchinson cannot recover in this case.

 In the District of Columbia, an alleged defamatory publication must be construed in the sense in which readers to whom it is addressed would ordinarily understand it. "The publication is to be read as a whole . . . . If after an examination of the entire article there is only one reasonable interpretation of its meaning, it is for the judge . . . to say whether

or not the words are defamatory." *Johnson v. Johnson Publishing Co.*, 271 A.2d 696 (D.C.Ct.App.1970). Only if a publication is libelous *per se* are questions of malice, truth, and privilege for the jury. The Restatement (Second) of Torts, an authority that is followed in the District of Columbia, *Harmon v. Liss*, 116 A.2d 693 (D.C.Mun. 1955), suggests that the only effect of a finding that a publication is libelous *per se* is to place the burden of establishing truth or privilege on the defendant, and recognizes that liability may be imposed only on a showing that the defendant actually knew of the falsity and defamatory nature of his statements, or recklessly disregarded the truth, or acted negligently in failing to ascertain the facts. Restatement (Second) of Torts § 569, comment b (Tent.Draft No. 21, April 5, 1975). Based on these principles, it is clear that in the District of Columbia, neither the press release and newsletters nor the statements attributed to Senator Proxmire or members of his staff constitute actionable libel or defamation.

 This conclusion is supported by the unmet averments of Mr. Schwartz and those of persons in state and federal agencies with whom he spoke during his investigation of Dr. Hutchinson's federal funding, but particularly, by the recognition in the District of Columbia of a defense to an action for defamation based on the doctrine of fair comment. In *Fisher v. Washington Post Co.*, 212 A.2d 335 (D.C.Ct.App.1965), an action by an art gallery owner against a newspaper based on allegedly libelous comments about the manner in which the gallery presented its paintings, the court held that the doctrine of fair comment was applicable. The court defined the doctrine:

"Fair comment or criticism on a matter of public interest is not actionable so long as the comment is not motivated by malice. . . . So long as the comment is the speaker's actual opinion, based on fact, about a matter of public interest, the words are protected unless they are grounded in malice or go beyond a discussion of the public works or acts of the subject of the opinion. . . . Fair comment is a complete defense . . . and the words are not made actionable by the fact that the complaining party is injured in his business reputation. . . . The fair comment defense goes only to opinions expressed by the writer and does not extend to misstatements of fact." *Id.* at 337.

 In the case here, the fair comment doctrine is a complete defense to Dr. Hutchinson's action with regard to the statements contained in the April, 1975 press release and the newsletters. The disposition of public funds is clearly a matter of public interest; and the opinions expressed were based on facts researched by Senator Proxmire's assistant, the defendant, Mr. Schwartz. Under these circumstances, the release and newsletters did not have to include all the facts on which the opinions were based, "[s]o long as the facts are available to the public, the criticism is within the doctrine of fair comment." *Fisher v. Washington Post Co.*, 212 A.2d 335, 338 (D.C.Ct. App.1965).

 It is also clear that in the District of Columbia the brief and innocuous statement Senator Proxmire made on the Mike Douglas Show did not constitute defamation, nor did any of the other statements about which Dr. Hutchinson complains. The law of the jurisdiction requires that in a suit for defamation there be proof of certainty as to the person defamed before liability can be imposed. Restatement of Torts § 564(b) (1938). The person defamed need not be specifically named; but the surrounding circumstances must be such that there is no doubt in the hearer's mind as to the person's identity. *Harmon v. Liss*, 116 A.2d 693, 695 (D.C.Mun.App.1955), citing Restatement of Torts § 564(b). In this case, the statement on the Mike Douglas Show did not name Dr. Hutchinson or even describe him with the clarity that would support a jury verdict against Senator Proxmire. The other statements were similarly innocuous.

 Under the law of Michigan, Dr. Hutchinson fares no better. That state recognizes a rule of qualified privilege for all

*bona fide* communications concerning any subject in which the party communicating has an interest, or in reference to which he has a legal, moral or social obligation to a person having a corresponding interest or duty. *Timmis v. Bennett*, 352 Mich. 355, 89 N.W.2d 748, 753 (1958); *Bufalino v. Maxon Bros., Inc.*, 368 Mich. 140, 117 N.W.2d 150 (1962). This rule was applied in *Timmis v. Bennett, supra,* an action by a police officer against an attorney for libel in a letter referring to conduct of the city's law enforcement. The court found that the rule included "statements made in good faith by a citizen . . . having or claiming to have, special knowledge . . . bearing on [a] matter of public concern and communicated to others concerned or interested." 89 N.W.2d at 755. The court explained the procedural consequences of a finding of qualified privilege, saying,

> "The meaning in law of a privileged communication is that it is made on such an occasion as rebuts the *prima facie* inference of malice arising from the publication of matter prejudicial to the character of the plaintiff, and throws upon him the *onus* of proving malice in fact, but not of proving it by extrinsic evidence only. . . . The effect, therefore, of showing that the communication was made upon privileged occasion is *prima facie* to rebut the quality . . . of malice [in law] and casts upon the plaintiff the necessity of showing malice in fact,—that is, that the defendant was actuated by ill will in what he did and said, with a design to causelessly or wantonly injure the plaintiff,—and this malice in fact, resting, as it must, upon the libelous matter itself and the surrounding circumstances tending to prove fact and motive, is a question to be determined by the jury. The question whether the occasion is such as to rebut the inference of malice if the communication be *bona fide* is one of law for the court, but whether *bona fides* exist is one of fact for the jury [citations omitted]." *Id.* at 753–54; accord *Harrison v. Arrow Metal Products Co.*, 20 Mich.App. 590, 174 N.W.2d 875 (1969).

*Timmis* indicates that the doctrine of qualified privilege applies in Michigan for the same reasons that the doctrine of fair comment applies in the District of Columbia. Thus, the burden is on Dr. Hutchinson to resist the motion for summary judgment by showing that in the trial of this case there will be evidence of malice in fact or ill-will. He cannot simply rest on his pleadings, but must make this showing once it is established that the occasion in question was privileged. In *Nuyen v. Slater*, 372 Mich. 654, 660, 127 N.W.2d 369, 373 (1964), where summary judgment for defendant was affirmed, the Supreme Court of Michigan said that "[i]f the circumstances relied on as showing malice are as consistent with its nonexistence as with its existence, the plaintiff has not overcome the presumption of good faith [established by defendant's showing of a qualified privilege] and there is nothing for the jury." No such showing has been made here by Dr. Hutchinson with regard to the press release or the newsletter.

As to the statement made on the Mike Douglas Show, and those claimed by Dr. Hutchinson to have been made on other occasions, it appears that the the law of Michigan, like that of the District of Columbia, requires certainty as to the person allegedly defamed before liability may be imposed. In *Lewis v. Soule*, 3 Mich. 514, 521 (1855), the Supreme Court of Michigan said that:

> "[T]he true test is . . . whether those who are acquainted with the person libelled, upon hearing the charge, are able to make the application. . . . Men generally talk, and write, to be understood; and when they design to speak of and concerning an individual, they either refer to him by name, or connect him with some fact or circumstances, by which those addressed, understood who is to be designated. That fact or circumstances must be known by those to whom

the communication is made; otherwise, nothing is communicated."

## V.

It follows, then, that in this summary judgment proceeding, the motion, pleadings, depositions, exhibits, and affidavits disclose there is no genuine issue of material fact to be resolved between the parties. The conduct about which Dr. Hutchinson complains is admitted by the defendant, Senator Proxmire. On the facts alleged in the complaint, indeed the only facts on which the plaintiff can base any claim for relief, it matters not whether he was a public figure, a public official or a private person. Therefore, this court concludes that defendant is entitled to judgment as a matter of law; and this is true whether the law applied to this case is that of federal jurisdictions, the District of Columbia where the conduct complained of originated, or that of the state of Michigan where Dr. Hutchinson lives and the claimed injury presumably was felt. *Bon Air Hotel Inc. v. Time, Inc.*, 426 F.2d 858 (5th Cir. 1970); *Perry v. Columbia Broadcasting System, Inc.*, 499 F.2d 797 (7th Cir.), *cert. denied*, 419 U.S. 883, 95 S.Ct. 150, 42 L. Ed.2d 123 (1974); *Washington Post Company v. Keogh*, 125 U.S.App.D.C. 32, 365 F.2d 965 (1966), *cert. denied*, 385 U.S. 1011, 87 S.Ct. 708, 17 L.Ed.2d 548 (1967); *Nuyen v. Slater*, 372 Mich. 654, 127 N.W.2d 369 (1964).

Accordingly, summary judgment will be entered in favor of the defendant Senator William Proxmire and against the plaintiff Dr. Ronald R. Hutchinson. And since on the facts alleged a claim cannot be stated on which relief can be granted against the remaining defendant, Mr. Morton Schwartz, this court serves notice on the plaintiff that because of the inadequacy of the complaint, it will, on its own initiative, dismiss the suit as to Mr. Schwartz, unless a showing is made within 30 days that such dismissal should not be ordered. *Literature, Inc. v. Quinn*, 482 F.2d 372 (1 Cir. 1973); *Dodd v. Spokane County, Washington*, 393 F.2d 330 (9th Cir. 1968).

## APPENDIX A

Office of
### SENATOR WILLIAM PROXMIRE
Wisconsin

FOR RELEASE AFTER 6:30 A.M. FRIDAY, APRIL 18, 1975

Senator William Proxmire (D.–Wis) announced on Friday, "My choice for the Golden Fleece Award for the biggest waste of taxpayers' money for the month of April goes jointly to the National Science Foundation, National Aeronautics and Space Administration and the Office of Naval Research for spending almost $500,000 in the last seven years to determine under what conditions rats, monkeys and humans bite and clench their jaws. From the findings of these studies it is clear that the Government paid a half million dollars to find out that anger, stopping smoking, and loud noises produce jaw clenching in people."

The Wisconsin Senator said, "This is the second in a series of "fleece of the month' awards which will climax in a Biggest Waste of the Year Award.

"All this money was given to Dr. Roland R. Hutchinson of Kalamazoo State Hospital in Michigan. Last year alone the good doctor spent over $200,000 of which more than $100,000 were federal funds. And what are some of the other results reached by these research projects in the last seven years?

"Dr. Hutchinson told NASA that people get angry when they feel cheated and tend to clench their jaws or even scream and kick. NSF learned that Dr. Hutchinson's monkeys became angry when they were shocked and would try to get away from the shock. In addition, NSF was informed that drunk monkeys do not usually react as quickly or as often as sober monkeys and that hungry monkeys get angry more quickly than well-fed monkeys.

"The Office of Naval Research appears to have gotten the same type of so-called research as did the NSF and NASA.

"It is very interesting to trace the history of these extremely similar and perhaps duplicative projects. In 1967, NSF gave Dr. Hutchinson $44,700 to study 'Environmen-

tal and Physiological Causes of Aggression.' For two years, Dr. Hutchinson studied the biting reactions of monkeys when they received electric shocks. He also compared their reaction while being given a number of different drugs as alcohol and caffeine. In 1969, the NSF gave Dr. Hutchinson another $26,000 to continue these experiments. He received another grant, this one for $51,200 in 1970 from the NSF.

"by this time Dr. Hutchinson was ready to extend his work to human biting and jaw clenching. In 1970, Dr. Hutchinson received a grant which ran for five years from the ONR to continue 'research on subhuman primates to determine the environmental, physiological and biochemical factors responsible for the maintenance of aggressive behavior and systematic replication of results obtained in primates extended to human subjects.' Total funding from the Navy ran to $207,000.

"During this period, Dr. Hutchinson applied for and received a $50,000 grant from NASA to develop measurements of latent anger or aggression in humans by means of jaw-clenching. In addition, Dr. Hutchinson received his fourth NSF grant in 1972 for $51,800 in order to continue his experiments on monkeys and extend the work to human jaw-clenching.

"Dr. Hutchinson, who in addition to being Research Director at Kalamazoo State Hospital, is also an Adjunct Professor at Western Michigan University and President of his own non-profit Foundation for Behavior Research, has proposals presently pending before the NSF, the National Institute of Drug Abuse, and the National Institute of Mental Health to continue research on monkeys' drinking, drug and jaw clenching habits. If Dr. Hutchinson is successful in this new grantsmanship attempt, he would receive an additional $150,000 of taxpayers' money.

"The funding of this nonsense makes me almost angry enough to scream and kick or even clench my jaw.

"Dr. Hutchinson's studies should make the taxpayers as well as his monkeys grind their teeth. In fact, the good doctor has made a fortune from his monkeys and in the process made a monkey out of the American taxpayer.

"It's time for the federal government to get out of this 'monkey business.' In view of the transparent worthlessness of Hutchinson's study of jaw-grinding and biting by angry or hard-drinking monkeys, it's time we put a stop to the bite Hutchinson and the bureaucrats who fund him have been taking out of the taxpayer."

Proxmire said that the public is urged to write him in Washington with suggestions for the "Golden Fleece of the Month" for May.