RELIANCE INSURANCE COMPANY,
Plaintiff,

v.

BARRON'S, sued in the name of Dow Jones & Company, Inc., Dow Jones & Company, Inc., and Abraham J. Briloff, Defendants.

No. 76 Civ. 4094.

United States District Court,
S. D. New York.

Sept. 14, 1977.

On Reargument Nov. 18, 1977.

Willkie, Farr & Gallagher by Michael Targoff, Robert E. Bartkus, New York City, for plaintiff.

Patterson Belknap, Webb & Tyler by D. Robert Owen, Gene Bauer, Robert D. Sack, New York City, for defendants Barron's and Dow Jones.

Phillips, Nizer, Benjamin, Krim & Ballon, by Paul Martinson, A. Brian Savin, New York City, for defendant Briloff.

## MEMORANDUM AND ORDER

BRIEANT, District Judge.

After exhaustive pre-trial discovery, upon a mound of papers submitted by both sides exceeding in volume those usually resulting from a plenary trial, defendants have now moved for summary judgment pursuant to Rule 56, F.R.Civ.P. If it appears clear that an essential element of plaintiff's claim cannot be proved at trial, for want of evidence, it is appropriate to grant the motion. Summary judgment is a remedy which must be applied when the

Court is convinced as a matter of law that the suit can have only one possible outcome. See *Epoch Producing Corporation v. Killiam Shows, Inc.,* 522 F.2d 737, 742–43 (2d Cir. 1975); *Applegate v. Top Associates, Inc.,* 425 F.2d 92, 96 (2d Cir. 1970). Indeed, as the recent cases of *Hotchner v. Castillo-Puche,* 551 F.2d 910 (2d Cir. 1977), *Edwards v. National Audubon Society, Inc.,* 556 F.2d 113 (2d Cir. 1977) and *Meeropol v. Nizer,* 560 F.2d 1061 (2d Cir. 1977) all demonstrate, the level of clear and convincing proof required now in this Circuit to show "actual malice" in a defamation case is almost insuperable. It is abundantly clear that this plaintiff cannot surmount the barrier.

Plaintiff, Reliance Insurance Company, filed its complaint on September 14, 1976, requesting compensatory damages of $7,500,000.00, general damages of $10,000,-000.00, special damages of $10,000,000.00 and punitive damages of $10,000,000.00, arising out of an article written by the defendant Dr. Abraham J. Briloff and subsequently published by the defendant Barron's in its July 19, 1976 issue entitled "Whose 'Deep Pocket'? At Reliance Group, the Slogan is 'Dig We Must'."

Reliance charges, in its complaint, that Briloff and Barron's violated § 10(b) of the Securities Exchange Act of 1934, as well as Rule 10b-5 promulgated thereunder, and the laws of the State of New York relating to libel and defamation, negligence and intentional tort.

*Facts*

Plaintiff Reliance Insurance Company (hereinafter sometimes "Insurance") is engaged in the property and casualty insurance and life insurance businesses. Of the common stock of Insurance, 96.9% is owned by Reliance Financial Services Corporation ("Financial"), the common stock of which in turn is wholly owned by Reliance Group, Incorporated ("Group") Reliance Group was formerly known as Leasco Data Processing Equipment Corporation. Group acquired control of Insurance in 1968.

On June 11, 1976 Insurance filed an S–1 registration statement pursuant to the Securities Act of 1933 and circulated a preliminary prospectus to the investment community with the intention of offering at public sale, two million shares of its Series A Cumulative Preferred Stock. This sale was scheduled for July 20, 1976.

The corporate defendant (hereinafter "Barron's") is the proprietor of a well known financial magazine published weekly in New York City. Because of the continuing interest in Group on the part of the financial community, editors of Barron's requested and received a copy of this preliminary prospectus sometime between June 11 and June 18, 1976. After studying the prospectus, the editors determined that several interesting financial questions were raised which might warrant treatment in an article in Barron's. The editors therefore asked defendant Dr. Abraham J. Briloff to review the prospectus with a view toward possibly writing an article. Dr. Briloff was sent a copy of the prospectus, as well as Group's 1975 Annual Report and Form 10–K and Financial's Form 10–K. Dr. Briloff holds the Emanuel Saxe Chair of Distinguished Professor of Accountancy at Baruch College of the City University of New York. In addition to teaching and lecturing in the field of accounting, Briloff has also published widely on this subject, writing articles on financial and accounting matters directed to nontechnical readers, including members of the investing public. He may be regarded, for our purposes, as a journalist or reporter, and is the Cassandra of the Accountants.

Three weeks later, sometime around July 4, 1976, Dr. Briloff delivered a first draft of an article to Barron's. According to Dr. Briloff's deposition testimony, he based his article on a review of the preliminary prospectus and other public documents, and research conducted at the Securities and Exchange Commission in New York, American Stock Exchange and New York Stock Exchange. Once received, the article was reviewed and edited at Barron's by Mr.

Steven S. Anreder, one of three News Editors employed by Barron's. Finally, the article was reviewed by Mr. Alan Abelson, Managing Editor of Barron's and Mr. Robert M. Bleiberg, Editor [in Chief] of the publication since 1955.

The Briloff article was published under the author's by-line, in the July 19, 1976 issue of Barron's of which there were more than 225,000 copies, reaching a wide readership in the financial community.

In the article, Dr. Briloff analyzed the proposed public offering of Insurance, and the accounting of Group. He concluded that the purpose of the public offering was to serve the interests and needs of Group rather than Insurance. The article charged that the proceeds of the sale were to flow upstream to Group, the parent, to the detriment of Insurance and its policyholders and minority shareholders. The article also implied, *inter alia,* that Group was employing certain "creative accounting" concepts, and engaging in improprieties, bad business judgment and breach of fiduciary duties, all of which led to its decision to market the proposed Series A issue.

The article consisted of 38 paragraphs covering approximately four pages of the July 19th issue. A full copy is attached hereto as Appendix A.

The Court regards the subject article as clearly defamatory of plaintiff, and probably also of Reliance Group. It also criticizes practices of Touche Ross & Co., the prestigious accounting firm serving the Reliance companies. For the most part, the article is opinion only. That Dr. Briloff sincerely holds the opinions expressed, and reached the conclusions uttered, after a professional consideration of public documents cannot be disputed. This is not the first time Briloff had publicly criticized the financial and accounting practices of the Reliance Group, and its corporate predecessor, Leasco. His criticisms appear to have brought about substantial revisions in the wording of the final prospectus. That a reasonably pru-

dent investor could purchase the issue, first reading the offending article, and believing it, defies imagination.

█ Strong public policies exist in favor of the right to publish such critiques as those contained in Dr. Briloff's article. Our federal securities laws are based on the theory that full disclosure will protect the integrity of the market place. The disclosure has tended to become so "full" in some situations, as to bury in legalese, in the interests of total accuracy, facts and possibilities flowing therefrom which should be simply stated in plain English and their possible consequences made known to potential investors. These defendants thought they were exposing to the public in plain language that which was either implicit in the circumstances surrounding the offering, or buried in the prospectus and other public filings of the Reliance companies. To do so is an important function of a free financial press, which should not be inhibited by judgments for damages of the sort sought here.

Plaintiff charges, in answers to defendants' first set of interrogatories that the article contained at least 37 false or misleading statements. Barron's denies that it made any false statements, with the exception of one error at paragraph 4 of the article in which there appeared a misquotation from the preliminary prospectus. This sentence reads as follows:

"Initially, according to the plan, 'the $47 million of net proceeds will serve to increase Reliance Insurance's Statutory Policyholders' Surplus, thereby *momentarily* increasing its underwriting capacity.'" (Emphasis added).

The word "momentarily" did not appear in the preliminary prospectus. When this error was brought to Barron's attention, a correction was made in the following week's edition.

The word "momentarily" adds little to the thrust of the sentence. A moment is an

indefinitely short space of time. "Momentarily" in this context means "at any moment: momentarily liable to occur." See American College Dictionary, Random House, New York 1970 ed. p. 784. Implicit in the preliminary prospectus is the suggestion that the dividend paying ability of Insurance would be improved, and that availability of funds for dividends would in fact occur momentarily, after completion of the offering. But the word did not belong in quotes.

In addition to this single misquotation, plaintiff alleges various false or misleading statements which result in defamation by implying in the broadest terms that Insurance, in its official filings, has falsified the purposes of its public offering.

These various statements can be divided into several categories. Plaintiff alleges that the article (a) falsely implied that the amount of the prospective common stock dividends was misstated in the prospectus; (b) falsely stated that the preferred offering was detrimental to Insurance and beneficial only to Group; (c) falsely stated that Insurance's "earnings power" had "sharply diminished" thereby impugning Insurance's ability to service the preferred offering while paying common stock dividends; (d) falsely or at least incorrectly described Provident's interest in Commonwealth, thereby accusing Insurance of accepting a worthless pledge; (e) erroneously implied by the use of the term "artificial respiration" that Insurance was financially "near death"; (f) was written with omissions and innuendo which falsely substantiated the claim that Insurance was financially unstable and that Group's "accounting gimmickry" might force Insurance into an uneconomic stock offering; and (g) contains false and misleading statements as to Group's financial stability which falsely substantiate the theme that the preferred offering was improperly induced by Group to Insurance's detriment.

After publication of the article, Insurance revised its preliminary prospectus and filed a final prospectus with the SEC. On August 17, 1976 the registration statement relating to the offering of the preferred stock became effective. On August 24, 1976, Insurance sold the two million shares of preferred to the public at a dividend rate of 10.72%. Plaintiff charges, and we accept as true for the motion, that this is approximately one percentage point more than the rate would have been had the article not been published. The resulting cost to Insurance over the 25 year life of the preferred issue was approximately $7,500,000.00.

On August 31, 1976, counsel for Group and Insurance wrote to Barron's and Dr. Briloff to demand a retraction of the various allegedly false and misleading statements in the article. No such retraction was published, and on September 14, 1976 this lawsuit was commenced.

*The Libel Claim.*

1. *Public Figure*

It is now well accepted that the plaintiff's status determines the standard of proof that such plaintiff will be required to present in making a defamation claim. If the plaintiff is a public official or public figure, then the plaintiff will have to show that the defendant published false statements against him with "actual malice," a word of art discussed below. *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974); *Time, Inc. v. Firestone*, 424 U.S. 448, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976). If, on the other hand, the plaintiff is not a public figure then he need only establish a minimum degree of fault in order to establish liability. Whether one is a public figure presents a mixed question of fact and law as to which defendants have the burden of persuasion. *Hotchner v. Castillo-Puche*, 404 F.Supp. 1041 (S.D.N.Y.), *rev'd. on other grounds*, 511 F.2d 910 (2d Cir. 1977). Here, the facts on which that

issue is to be determined are not in dispute. The Court, then, at least in this case, must make the initial determination of whether Insurance is a public figure before reaching the question of whether plaintiff has presented a material and genuine issue of fact with respect to the actual libel alleged.

The standard for determining whether or not a person or corporate entity is a public figure is set forth in *Gertz v. Robert Welch, Inc., supra*. First, *Gertz* defines those who are the subject of the *New York Times* standard:

"Those who, by reason of the notoriety of their achievements or the vigor and success with which they seek the public's attention, are properly classed as public figures . . . ." *Id.*, 418 U.S. at 342, 94 S.Ct. at 3008.

The Court then observed that:

"Public officials and public figures usually enjoy significantly greater access to the channels of effective communication . . . ." *Id.* at 344, 94 S.Ct. at 3009.

■ ■ A public figure is one who has voluntarily invited close public scrutiny by thrusting himself into the public arena. Finally, *Gertz* sets forth two categories of public figures: public figures for all purposes and those whose lives are only public in limited circumstances.

"For the most part those who attain this status have assumed roles of especial prominence in the affairs of society. Some occupy positions of such persuasive power and influence that they are deemed public figures for all purposes. More commonly, those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved. In either event, they invite attention and comment." *Id.* at 345, 94 S.Ct. at 3009.

In attempting to apply this "public figure" analysis to corporations as opposed to natural persons, courts have differed in their method of analysis. In *Martin Marietta Corp. v. Evening Star Newspaper*, 417 F.Supp. 947 (D.D.C.1976), the court concluded that the *Gertz* analysis was inapplicable to corporations since they are all, by definition, not private persons, and therefore do not require the special protection afforded to individuals in protecting their "private lives." A defamation action by a corporation does not involve "the essential dignity and worth of every human being," considerations of concern in a libel action brought by an individual involuntarily thrust into the public eye and reviled. The Court in *Martin Marietta* therefore applied the test set forth in *Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971) (disavowed in *Gertz* with respect to natural persons), which provides that any person involved voluntarily or involuntarily in a matter of public interest can only be libelled by a false statement made with "actual malice." Using this test the Court found that Martin Marietta was certainly involved in a matter of public interest, *i. e.* corporate entertainment of government officials at privately funded stag parties. As an alternative ground for this holding the Court also found that Martin Marietta was a public figure under the *Gertz* definition since it had "thrust" itself into a public controversy thereby becoming a public figure for the purposes of the issues involved.

In *Trans World Accounts, Inc. v. Associated Press*, 425 F.Supp. 814 (N.D.Cal.1977), the court rejected the approach of *Martin Marietta*, preferring to apply the *Gertz* standard to corporations as well as natural persons. Using the *Gertz* analysis, the court found that Trans World Accounts was a public figure under the second test of *Gertz* by having been "drawn into a public controversy."

It appeared preferable on this motion for summary judgment to follow *Trans World Accounts*, and consider whether Insurance is a public figure in accordance with the terms set forth in *Gertz*. See also, *Time*,

1348

*Inc. v. Firestone*, 424 U.S. 448, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976); *Rinaldi v. Holt, Rinehart & Winston, Inc.*, 42 N.Y.2d 369, 397 N.Y.S.2d 943, 366 N.E.2d 1299 (1977).

■ We find that plaintiff is indeed a public figure. It is a large corporation with more than a billion dollars in assets. Nearly all of its common stock is owned (through Financial) by Group, a publicly held company whose shares are traded on the New York Stock Exchange. There has been great public interest in Insurance and its affiliated companies over the past several years, particularly with respect to the circumstances surrounding its acquisition. [See, *Feit v. Leasco Data Processing Equipment Corp.*, 332 F.Supp. 544 (E.D.N.Y. 1971)]. Insurance's business is in a field subject to close state regulation, and the company files periodic reports with the SEC and the New York and Pennsylvania Departments of Insurance. In addition, Insurance was, at the time of the libel, offering to sell its stock to the public, thereby voluntarily thrusting itself into the public arena, at least as to all issues affecting that proposed stock sale.[1] Accordingly, it is clear that Insurance is certainly a public figure with respect to issues involving its offering of securities to the public.

Indeed, plaintiff's role in society is such that it is a figure generally in the public eye. I find that plaintiff is a public figure in the general sense, and also in the specific context of its decision to make a $50 million public stock offering. See *Hutchinson v. Proxmire*, 431 F.Supp. 1311 (W.D.Wis.1977); *Trans World Accounts v. Associated Press, supra; Wolston v. Reader's Digest Ass'n, Inc.*, 429 F.Supp. 167 (D.D.C.1977); *Martin Marietta Corporation v. Evening Star Newspaper, supra; Hotchner v. Castillo-Puche, supra; Meeropol v. Nizer*, 560 F.2d 1061 (2d Cir. 1977).

Plaintiff's efforts to avoid the label of a public figure are unavailing. Although Insurance did not have access to the media during the period of registration, because of peculiarities of federal securities law, it does have and has exercised its access to "channels of effective communication." (*Gertz*, 418 U.S. at 344, 94 S.Ct. 2997).

Reliance argues that it should not be treated as a public figure because it was, at the time of the libel, "in registration" and therefore lacked the media access to counteract the libel which is normally available to a public figure, and one of the theoretical underpinnings for the "actual malice" rule. We find nothing in *Gertz* or its progeny which would remove "public figure" status from an offeror during the brief time it is in registration. The "access to media" argument is no more than a makeweight. There are many public figures who are so scorned and reviled by the media as to have little or no access for purposes of counteracting a libel. These remain yet public figures.

The suggestion that Reliance could not respond is based on the assertion that after filing its S–1 Registration Statement on June 14, 1976, and until it became final (usually 20 days—August 17, 1976 in this case) Reliance was "effectively prohibited from publicly commenting on its Series A Cumulative Preferred Stock, lest such comment be interpreted [by the SEC] as an 'offer to sell' the preferred" (Pltfs. br. p. 16).

■ The Court doubts that the SEC Release cited, No. 5180, 17 C.F.R. § 231.5180, or 15 U.S.C. § 77e upon which it is ostensibly based, intended to prevent an issuer in registration from denying or disputing a defamatory article. It should be possible so to word a denial as not to constitute an offer to sell. To the extent the SEC pur-

1. Filing a preliminary or red herring prospectus, a matter of public record, is theoretically *not* an offer to sell securities, which can be made only when the registration becomes final. But by doing so, an issuer thrusts itself into the public eye, indicating by its action that it intends to have the registration become complete and that the preliminary prospectus will mature into a final one, with resultant distribution of securities to the public.

ports to deny an issuer this fundamental right, that would appear to be a usurpation of power, and violation of the issuer's First Amendment rights. We need not reach the question here, since, as noted, one who has no practical access to the media to get his denials and justifications before the public, will yet be a public figure if he has thrust himself into a public controversy.

Insurance next argues that it is not a "household word" and that a majority of jurors would not recognize its name. The "household word" standard is not determinative in any event. See *Meeropol v. Nizer, supra*. Probably plaintiff is well known among Barron's readership, and a well recognized name in the financial and business community.

Finally, Insurance argues that it is not a public figure since it did not "thrust" itself into the media. This is simply untrue. By its very nature as a large publicly held, government-regulated corporation, and additionally because of its voluntary decision to make a public stock offering, Insurance has, in fact, thrust itself into the public eye.

We must acknowledge that the public interest is well served by encouraging the free press to investigate and comment on business and corporate affairs in the same manner as it would report on other public issues. As we observed in *Reliance Insurance Co. v. Barron's*, 428 F.Supp. 200, 205 (S.D.N.Y.1977):

"Investigative reporting is not limited to the impeachment of presidents or the exposure of licentious congressmen. The public interest is served equally when reporters find a 'Deep Throat' in the executive suite, and when an accounting professor spotlights for the financial press, in common language, business dealings he regards as improper, improvident or unfair to investors. Whether his conclusions are right is to be resolved generally in the free market place of ideas."

When such reporting concerns the financial transactions of a large public corporation, the public interest in maintaining the free marketplace of ideas must outweigh plaintiff's claim to the sanctity of private status. As stated in *Edwards v. National Audubon Society, Inc.*, 556 F.2d 113, at 122 (2d Cir. 1977):

"[W]e believe that the interest of a public figure in the purity of his reputation cannot be allowed to obstruct that vital pulse of ideas and intelligence on which an informed and self-governing people depend. It is unfortunate that the exercise of liberties so precious as freedom of speech and of the press may sometimes do harm that the state is powerless to recompense: but this is the price that must be paid for the blessings of a democratic way of life."

### 2. Actual Malice

In *New York Times, supra*, the Supreme Court defined "actual malice" as publication "with [the] knowledge that it was false or with reckless disregard of whether it was false or not." *Id.*, 376 U.S. at 279–80, 84 S.Ct. at 726. The Court required that "actual malice" be proved with "convincing clarity." *Id.* at 285–86, 84 S.Ct. 710. In *St. Amant v. Thompson*, 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968) the Court further refined its definition by explaining the term "recklessness."

"[R]eckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *Id.* at 731–32, 88 S.Ct. at 1325. (Underlining added)

Although these definitions distort common English, they must be taken at face value. In the context of a libel suit "actual malice" simply does not mean ill-will or spite. Rather, "malice" must be taken to mean fraudulent, knowing, publication of a falsehood, or reckless disregard of falsity. And we also note that reckless

does not mean grossly negligent, its common use, but rather intentional disregard. When the Supreme Court uses a word, it means what the Court wants it to mean. "Actual malice" is now a term of art having nothing to do with actual malice. The question, then, is whether the plaintiff on this motion has established the existence of a genuine issue of material fact with respect to whether the article was written and published with "actual malice," as above defined.

Plaintiff argues that it has raised a factual issue on the question of actual malice by demonstrating errors or inaccuracies in the article, by the timing of the article, by the failure of Barron's properly to edit and verify the article, by Barron's purposely and selectively omitting material, and by the "snide" tone of the article taken as a whole. We shall discuss each of these issues in turn.

■ (a) *Errors*: Plaintiff argues that the insertion of the word "momentarily" into a quotation from the prospectus is proof of actual malice. In support of this contention plaintiff argues, correctly, that "actual malice" can be proved by inference from circumstantial evidence such as misquotation, citing *Goldwater v. Ginzburg*, 414 F.2d 324 (2d Cir. 1969) in support of this position. Here, plaintiff has been able to show only this one case of actual misquotation. No matter how misleading this misquotation might be, it is not sufficient evidence in and of itself to establish actual malice. In *Goldwater*, misquotation was only one of several methods used purposely to distort the truth. As stated in *Goldwater*:

> "As can be seen, appellee and the district judge did not rely on a few isolated instances of derogatory statements which could be charitably thought of as being nonactionable negligent or good faith misstatements of fact, but rather upon the totality of appellants' conduct, as evidenced by the proffered materials, from which a jury might reasonably find a

predetermined and preconceived plan to malign the Senator's character." *Id.* at 337.

■ Since plaintiff has been unable to point out any other example of misquotation or falsification of a hard fact (as distinguished from an opinion), evidence of error(s) alone is insufficient to raise a factual question on the issue of actual malice in the context of this case. We must affirm the longstanding principle that inaccuracy itself will not demonstrate "actual malice" in a libel case. Even if there were a dozen errors in this article, mistakes or bad judgment will not substitute for knowing falsehood or reckless disregard as to falsity, when the uncontradicted testimony reveals that the author and publisher held the good faith belief that the article was correct and truthful.

■ Stating good faith is not enough to exonerate a defendant. But when the defendant has asserted his good faith under oath, and no evidence whatever exists to counteract that assertion, then it must be credited.

It is at this point that we consider the status and reputation of the author. Dr. Briloff is an acknowledged expert in the field of accounting as evidenced by his full-time profession as a Professor of Accounting and by his many publications and lectures in the field. The source of this article was therefore of known quality. Compare, *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967) with *Martin Marietta Corp. v. Evening Star Newspaper*, 417 F.Supp. 947 (D.D.C.1976). Unlike pornographer Ginzburg in the *Goldwater* case, *supra*, Dr. Briloff is an expert in accounting, the relevant discipline, who gathered much material concerning Insurance, reviewed that material, and then published his own opinion of Insurance's stock offering. This is not the case of an unreliable informant (*Butts*) or of a conceded nonprofessional giving a psychiatric opinion (*Ginzburg*) who publish their opinions as

fact without any basis in fact. Although Dr. Briloff's opinions may have been erroneous they cannot be said to have been uttered with actual malice as above defined.

**(b)** *Timing of the Article*: Insurance argues that the publication of the article in the July 19th issue, approximately one week prior to the date the stock was to be sold, is circumstantial evidence of the defendants actual malice. Insurance contends that defendants desire to publish the critique prior to the offering demonstrates their awareness of the impact of the article on the investing public and the harm it would cause Reliance. We reject this evidence as proof of "actual malice." Dr. Briloff and Barron's are both in the business of educating or informing the public. It is beyond dispute that the article would have its greatest impact on the public if it appeared prior to the sale. This desire to publish prior to the sale is praiseworthy rather than blameworthy. Prior to its sale, the offering was "hot news" in the financial community. If the function of the financial press is to inform and educate the investing public with hot news, which we believe it is, then the editors have an actual duty to publish at the time of greatest benefit. After the issue had been sold, news bearing on its investment quality would have been of no use to the readers. Even if the timing of the article could be construed to demonstrate a hidden or subconscious desire by Dr. Briloff and Barron's to harm Insurance, this still is not evidence that the defendants knew the article was false, or published the article with a reckless disregard as to truth or falsity.

**(c)** *Barron's Editing Process*: Insurance argues that Barron's editing was so lax and slipshod and so removed from its normal procedures as to constitute evidence of actual malice on its part. Plaintiff specifically charges that Barron's failed to investigate and verify much of the material provided by Dr. Briloff. Once again the Court cannot agree that Barron's editorial con-

duct was so slipshod as to provide evidence on which to base a finding of actual malice.

A mere failure to investigate does not constitute "actual malice." *St. Amant v. Thompson*, 390 U.S. 727, 731, 733, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968). Furthermore, there may be no requirement to investigate an article which is primarily a critique (an opinion) of a publicly filed document. It is true that if there is a complete departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers, that may be some evidence of actual malice. See, *Curtis Publishing Co. v. Butts, supra.* In *Butts* a news article was published concerning the head football coach of the University of Georgia, accusing him of disclosing game strategy to the opposing team. The information on which the report was based was provided by a convicted felon. No efforts were made by the publishers to verify the report although there was a live witness to the supposed conversation disclosing game strategy. The author of the article was not a football expert, and did not even view the game films to ascertain whether or not the opposing team acted as if it was aware of the strategy.

In stark contrast are the facts of this case. Here, the article was authored by a reputable member of the accounting community, who holds strong and genuine views about Reliance, and about what he regards as some of the current failings of the accountants. In addition, the article was primarily no more than a critique or a personally held opinion concerning matters of public record. Finally, the editors of Barron's have testified that they did in fact apply their usual editing procedures to the article, including discussions with the author, stylistic and copy editing, spot checking of some of the sources cited by the author, and reviewing drafts and redrafts in consultation with the author and other editors. There is simply no evidence offered here that Barron's knowingly depart-

ed from its usual procedures so as to publish an article recklessly without regard to its truth or falsity.

(d) *Selective Omissions*: Plaintiff argues that the article omitted information which was pertinent to the offering. Had this information been included, plaintiff contends, the article would not have been false and misleading. Plaintiff submits that the selective omission of relevant data provides circumstantial evidence of defendants' actual malice.

■ We do not accept plaintiff's contention. Obviously the author of an article will have to choose which facts to include and which to omit. It is impossible to print *all* of the facts on which an opinion or belief is based, especially when an article comprises a critical analysis of a company's accounting practices. Were the courts or criticized corporations to be allowed to dictate the contents of such articles, censorship would have won out over free speech and the right to dissent. See *Time, Inc. v. Pape*, 401 U.S. 279, 91 S.Ct. 633, 28 L.Ed.2d 45 (1971); *Hutchinson v. Proxmire*, 431 F.Supp. 1311 (W.D.Wis.1977).

(e) *"Snide" Tone of the Article*: Plaintiff finally argues that the tone of the article was generally snide, full of innuendo and hidden uncomplimentary swipes and cheap shots, and highlighted by the jabbing headlines. Plaintiff contends that this tone is circumstantial evidence of defendants' actual malice in writing and publishing this article.

■ The Court has read the article, the depositions, the answers to interrogatories and the exhibits submitted in connection with this motion. The Court has found no factual support for the contention that defendants published the article with "actual malice." The Court did, of course, notice the uncomplimentary tone of the article. But this does not in any way tend to prove that the author knew that statements in his article were false or that he had a reckless disregard, that is, entertained a serious doubt, as to the truth or falsity of his article. The fact that the publishers allowed the "snide" tone to permeate the article similarly is no evidence that the article was published with actual malice. We recall once again that "actual malice" does not mean hatred or contempt. Journalists are entitled to have and to express such views; that is no more than robust First Amendment expression.

The Court is aware that any article replete with snide innuendos can be hurtful to a subject, and indeed may damage him in his business or reputation. But if he is a public figure, then he must bear the risk of such publicity as the price he pays for conducting activities or business in the public arena. If the financial press, or the press at large, had to fear libel suits when expressing dislike of certain persons or firms, or of business or other practices, the self-censorship that would inevitably occur would have a stifling if not smothering effect on the functioning of a free press. Public figures are exposed to public comment. Such comment will not be libelous unless the commentator wrote with "actual malice," as defined by the Supreme Court, and as contrasted with actual malice, or mere aversion or scorn.

### Conclusion

■ Since the Court has found that plaintiff is and will be unable on a trial to demonstrate the required "actual malice," defendants' motion for summary judgment on the libel claims is granted.

The claims for intentional tort and negligence pleaded under state law add nothing to the libel or defamation claim and summary judgment is also granted as to them.

### The Rule 10b–5 Claim

■ Because of our conclusions above we probably need not reach a tantalizing question sought to be posed by this com-

plaint, namely: Could there ever be a case where a newspaper which has no financial interest in a securities transaction could be found liable for a violation of Rule 10b–5 because of a false report published bearing on securities offered for sale? *In re Republic National Life Insurance Company*, 387 F.Supp. 902 (S.D.N.Y.1975); *Milberg v. Western Pacific Railroad Company*, 51 F.R.D. 280 (S.D.N.Y.1970), *appeal dismissed sub nom. Korn v. Franchard Corp.*, 443 F.2d 1301 (2d Cir. 1971). Here, the Rule 10b–5 claim must fail if only because plaintiff has been unable to establish that there is a genuine issue of material fact as to the required element of scienter. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). *Hochfelder* requires that a plaintiff seeking damages for a violation of Rule 10b–5 must allege and prove injury resulting from an "intent to deceive, manipulate or defraud." 425 U.S. at 194, n. 12, 96 S.Ct. at 1381. No such intent can be proved on the facts of this case. Even if recklessness were sufficient to prove the required scienter, recklessness has been defined in this Circuit as "a willful, deliberate, or reckless disregard for the truth that is the equivalent of knowledge." *Lanza v. Drexel & Co.*, 479 F.2d 1277, 1305 (2d Cir. 1973). We have already found that neither Dr. Briloff nor Barron's acted with such reckless disregard for the truth. Therefore, for that reason alone, plaintiff is unable to sustain a cause of action based on Rule 10b–5.

■ In addition, the Court concludes that the allegation of a violation of Rule 10b–5 is being pleaded here as a method of circumventing the higher evidentiary threshold developed by the Supreme Court to limit state actions for libel. This is a misuse of the securities laws. Plaintiff's case, if it has one, is a libel action pure and simple. The securities laws, and particularly Rule 10b–5, were not developed with the intention of overlapping or reinforcing the law of libel, nor to inhibit the exercise of freedom of the press.

As we have seen recently, the heyday of the unfettered extension of the federal se-curities laws to recompense all those damaged, has ended. See, *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977); *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975).

■ There is no evidence that Dr. Briloff, or the Barron's editors who acted with respect to his article, purchased or sold any Reliance securities at or about the time of the offending article, or that they were acting in collusion with persons who did so. Nor is there any evidence that defendants published with intent to manipulate stock prices, or to defraud potential investors or aid and abet those so engaged. Indeed, implicit in the article itself, defendants' intention was to the contrary: to alert potential purchasers to the likelihood that investment in paper sold by any business controlled by Group was fraught with peril. Thus, defendants "simply do not fall into any of the categories of non-privity parties who have been held liable to defrauded purchasers and sellers under Rule 10b–5." *In Re Republic National Life Insurance Co.*, 387 F.Supp. 902, 905 (S.D.N.Y.1975).

Without such a financial interest, direct or through others, the intent to defraud or manipulate required by *Hochfelder, supra*, is unlikely to exist. Distinguishable are situations where a publisher uses his First Amendment rights intentionally to effect a fraud or manipulation for his own financial gain, as was found in *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963); *Courtland v. Walston & Co.*, 340 F.Supp. 1076 (S.D.N.Y.1972).

Defendants' motions for summary judgment are granted and the Clerk is directed to enter Judgment pursuant to Rule 58, F.R.Civ.P. that all relief be denied on all claims pleaded.

So Ordered.

Exhibit A to follow.

# BARRON'S

JULY 19, 1976

NATIONAL BUSINESS AND FINANCIAL WEEKLY    © DOW JONES & CO., INC.    75 CENTS

## UP & DOWN WALL STREET

### By ALAN ABELSON

JIMMY and Fritz? They've got to be kidding. How can you vote for a pair who sound like, respectively, the day and night bartenders at the Killarney Rose? Poor Mondale! Scarcely nominated before *The New York Times* was laying Thursday's stock market decline on him. Actually, it could have been Eenie, Meanie, Minie or Moe—the *Times* still would have fingered the choice as the reason for the drop. (The real reason prices fell, of course, was the National League's victory in the All-Star Game. The Nationals have won five in a row, a history of monopolizing the event that's sure to draw a probe by the Justice Department, with dire potential for such pivotal economic sectors as mustard manufacturing.) As it was, the sole speck of suspense in last week's proceedings was Mr. Carter's variation of "Ten Little Indians" called "Six Little Democrats." We confess to some surprise that Mr. Carter did not go to Church. Or that John Glenn, of all people, couldn't get off the ground. Still, in the end, Mr. Carter made his selection on strictly non-political grounds: Minnesota has more votes than Maine.

Harmony (as in harmony and grits) was distressingly pervasive throughout the convention. Who could believe the Democrats would decline so far, so fast? We don't want to exaggerate: there were, we're happy to say, some muted notes of discord. On this score, one youthful offender was Jerry Brown. Cesar Chavez nominated the California Governor in a rambling talk, which, when all was said and done, added up to a bunch of sour grapes. Indeed, Cesar may have come to praise Mr. Brown, not to bury him, but he wound up doing both. Mr. Mondale's acceptance speech sounded like Hubert Humphrey in a hurry (which, at least, is better than the original). Mr. Carter's sermon, in a peanut shell, was Everyman promising everything to everybody. Both Mr. Carter and Mr. Mondale pointedly indicated they will be running against Richard Nixon, who, we suspect, will not be on the Republican ticket. But that seems fair enough, since whoever is chosen to bear the GOP standard—either Mr. Reagan or Mr. Ford—doubtless will run against Washington, a place so evil they both can't wait to get there.

#### Gold Rush of '76

While the prayer meeting at Madison Square Garden was unmistakably the week's leading non-event, the rest of the world didn't exactly stop spinning. Up in Canada, for example, on the eve of the Olympics, Mr. Trudeau approached the thorny issue of Taiwan with all the subtlety of a bull in a china shop, thus demonstrating the same deft touch in dealing with international affairs as he does in the handling of his nation's business. Thanks to the latest IMF dumping of the stuff, the great gold rush of '76—to unload—took on the makings of a good old-fashioned panic. But take heart, gold bugs! Dick Donnelly, from his privileged perch in Commodities Corner, assures us that the intrinsic value of the metal is at least $5 an ounce.

Barely had we finished congratulating the Fed on how nice and orderly things were on the monetary front, then M1, M2 and all the other Ms ballooned like a helium freak with a free hose. For every billion change in the money supply, there are at least an equal number of explanations. And, who knows?, one of them may even be right. This week's favorite is that the latest surge is akin to the aberrational behavior we were treated to in the spring and, now as then, is the result of a rundown of Treasury balances. Couple of more weeks of this, of course, and the Fed might again nervously begin to tap on the brakes. Dreary prospect and let's hope it doesn't come to pass.

For the nonce, we've a hunch, the market is apt to respond to influences other than the fitful fluctuations in the money supply. Like those second-quarter earnings reports (see Larry Ar-

Continued on Page 27

## Hot—and Cold—Issues

see page 3

New offerings of common stock have finally revived. Score of companies, mostly high technology, come to market; dozens of others wait in wings. Cray Research goes to premium, while The Gap, Mayflower sag. Unterberg, Towbin back in business.

## Whose "Deep Pocket"?

**5**

At Reliance Group, the slogan is "Dig we must." Proceeds of proposed sale of preferred shares by insurance subsidiary likely to find way into parent's hard-pressed coffers via dividends. Despite alleged reforms, accounting gimmickry alive and well. The banks get theirs.

## First-Class Fiasco

**7**

The Post Office monopoly is that and more. Costs, deficits mount while Robert Black, Kansas entrepreneur, is brought to book for underselling the 13-cent stamp. Efficiency without stockholders, competition a political pipedream. Vengeance in a California courtroom.

*—Editorial Commentary*

## 9   Critique of "Critical Choices"

From Rockefeller's Commission, a skimpy contribution to public debate. His scholars automatically opt for greater government intervention, shun free market solutions. One way to spend nearly $5 million.

## 11   Educated Guess

That's what investors in dormitory bonds are making. Fat yields reflect uncertainties, notably in New York State, over future enrollments, financing capacity.

## 37   Tassel and Silk

Mother Nature is doing her thing this week in the Corn Belt.

---

### INVESTMENT NEWS & VIEWS

| | | | |
|---|---|---|---|
| 29 | Marathon Oil Co. | 32 | Western Air Lines Inc. |
| 31 | Airco Inc. | 34 | Castle & Cooke Inc. |

### DEPARTMENTS

| | | | |
|---|---|---|---|
| 4 | The World at Work | 45 | Index to Statistics |
| 7 | Barron's Mailbag | 74 | Speaking of Dividends |
| 39 | The Striking Price | 74 | The Week in Bonds |
| 41 | Barron's on Books | 78 | Market Laboratory |
| 45 | The Trader | | |

# Whose "Deep Pocket"?

## At Reliance Group, the Slogan Is "Dig We Must"

By Abraham J. Briloff

ONE of these days Reliance Insurance Co.—the 159-year-old casualty and fire underwriter owned by Reliance Group Inc.—hopes to raise $50 million from the public. Since roughly mid-June, the Philadelphia-based insurer has had on file with the SEC a prospectus covering a proposed offering of two million shares of a new Series A cumulative preferred stock. Managed by White, Weld & Co., the deal could net Reliance as much as $47 million.

In view of the near-catastrophic conditions in the casualty field in recent years, news that another insurer is in the market for funds is hardly cause to stop the presses. But Reliance Insurance rates as a special case: its corporate parent, Reliance Group, has come to depend heavily upon it for financial assistance. And, indeed, a hefty share of the funds to be raised via the proposed offering eventually may find its way into the coffers of the Park Avenue-based parent.

To understand how such a transfer may be effected and, equally important, the reasons that made it necessary, we must take a critical look at the preliminary prospectus as well as some other documents, especially the annual forms 10-K filed with the SEC by this nexus of companies. Early on we discern the strenuous efforts over the past year or so that have gone into shoring up Reliance Insurance's own finances, which have caused serious concern on the part of regulators in Pennsylvania and New York. And we discover anew that so many critical barriers separate the substantial liquid resources of the insurance operations from the enormous needs for funds of Reliance's leasing operations (carried on through other Group subsidiaries) as to absolutely prohibit full consolidation of the balance sheets. When we separate the operations there is less to Reliance Group than meets the eye.

### Dependent Parent

It is on this score that the financing is noteworthy. Initially, according to the plan, the $47 million of net proceeds will serve to "increase Reliance Insurance's Statutory Policyholders' Surplus, thereby momentarily increasing its underwriting capacity." But then, we're told, the newly infused funds will "improve (Insurer's) dividend payment capability." Thus, except for $2 million which will be "capitalized" on Reliance Insurance's books, "the proceeds may be used in the discretion of the Board of Directors . . . for the maintenance or increase in dividends on Reliance Insurance's stock." All but 3.1% of Insurance's stock is owned by Financial Services, of which all, in turn, are owned by Group.

The prospectus, moreover, informs the prospective purchaser of the vital role which Insurance's dividends play in the Group's financial viability. Thus, "Reliance Insurance common stock dividends . . . are the primary source of Reliance Financial's funds (and) have been essential to Reliance Financial for payment of its indebted-

ness . . ." Then moving upstream: "Similarly, a principal source of funds for Reliance Group during recent years have been dividends or advances from Reliance Financial."

Initially after the preferred stock will have been sold, we are told Insurance's Board of Directors—made up of the same people who sit on the boards of Reliance Financial and Reliance Group—will consider a boost in the common stock dividend which could equal $4 million to $10 million on an annual basis. But then the prospectus points to the possibility that Insurance's Board of Directors might not stop here: "The importance of Reliance Insurance common stock dividends to Reliance Financial and, ultimately, to Reliance Group is not expected to decrease in the near future. Accordingly, an additional factor which will be considered by the Board of Directors in making decisions relating to Reliance Insurance common stock dividends will be the importance of such dividends to Reliance Financial and Reliance Group." And it adds a further caveat: "Because of Reliance Group's control of Reliance Financial and Reliance Insurance and the identity among the boards of directors of these three companies, such decisions involve potential conflicts of interest."

An important insight into the urgent cash requirements of Reliance Group can be obtained from the "Parent Company Only" statements included with the 1975 form 10-K. The cash movements can be summarized as follows (amounts in $ million):

Sources:

| Dividends from subsidiaries | | |
|---|---|---|
| Leasco Capital Equipment | $4 | |
| Reliance Financial Services | 4 | |
| All Others | 4 | $12 |
| Management fees from subsidiaries | | 3 |
| New borrowings from subsidiaries | | 19 |
| Collections of receivables and other | | 2 |
| Total sources | | $36 |

Uses:

| Payments of Expenses: | | |
|---|---|---|
| Interest | $23 | |
| Selling, general & Administrative | 5 | $28 |
| Dividends on preferred and common stock | | 3 |
| Payment on account of notes | | 7 |
| Payments of accounts payable and accruals | | 1 |
| Total uses | | $39 |
| Net decrease in cash during the year | | $ 3 |

According to the 10K of Leasco Capital, the subsidiary which acts as a

domestic lessor of computer equipment (Reliance Group's initial business when it got started on its road to stock market fame), Leasco had a deficit in retained earnings at the end of 1975 and thus could no longer pay dividends to its parent Group. Further, during 1975 this subsidiary loaned $9 million to Group. Dividends and the loans just about add up to the $15 million reduction last year in Leasco's cash balances—which declined from $19 million to $4 million. Apparently the drying-up of this source (possibly exacerbated by Leasco's having sold and/or hocked its chief assets, namely computer leases), has prompted Group to look elsewhere for fresh resources

So far as Reliance Insurance is concerned, its earnings power over the past two years has so sharply diminished (it lost money in '74 and eked out a small profit in '75, thanks chiefly to tax credits), that as the prospectus plainly says, it's paid out in dividends over the past two years more than it's earned. Moreover, the "red herring" reveals the pressures the regulatory authorities, especially the Pennsylvania Insurance Department, have been exerting on the company to improve its financial condition. Thus, we find: "During 1974 and 1975 several regulatory authorities repeatedly expressed serious concern regarding the declaration of further dividends on the common stock of Reliance Insurance in view of its Statutory Policyholders' Surplus position and suggested, among other things, that Reliance Group take measures to increase such surplus."

### I-O-I?

The principal move by Reliance Group to shore up the insurance company's resources involved a complex scheme to add substance to $26.5 million in notes owed by the holding company to Reliance Insurance. These notes stemmed from the fact that the parent, over the years, exacted taxes from its subsidiary as though the insurance firm had filed its own return with the government. (Reliance Group, of course, avoided any ultimate remittance to Uncle Sam since it had a surfeit of minuses to offset the insurer's pluses on a consolidated return.) Because of the precipitous losses sustained for tax purposes by Reliance Insurance in 1974 and 1975, the underwriter was entitled to refunds from its parent, as though it were claiming refunds of taxes from

### REDUCED RATING

DJ, July 15—Reliance Financial Services Corp.'s $50 million of 8½% debentures due 1992 have been downgraded to a double-B rating from triple-B by Standard & Poor's Corp.

In a related move the agency assigned a triple-B rating to the proposed offering of two million "new Series A preferred shares by Reliance Insurance Co., a unit of Reliance Financial Services."

S&P said the actions reflect the fact that the new preferred stock would have prior claim on dividend declarations of Reliance. Insurance, the major source of cash flow to Reliance Financial Services.

the government because of operating loss carrybacks.

Since the holding company's fiscal position was not as good as the government's, Reliance Group could not pay the refunds in cash. Instead, Reliance Group issued notes to Reliance Insurance. Understandably, perhaps, these notes were not looked upon with favor by the regulatory agencies, and therefore were excluded from admitted assets when figuring the insurance-writing potential of Insurance.

Consequently, on Dec. 23, 1975, a tripartite arrangement was worked out: Reliance Financial guaranteed the notes and, as an incident to that guarantee, pledged as collateral all the common stock of Commonwealth Land Title Insurance Co. (a wholly owned subsidiary of Reliance Financial, acquired in January 1975, by the issuance of $30 million worth of a new "preferred stock"). This set-up appears to have satisfied the Pennsylvania authorities but, apparently, has evoked a cold response from officials in New York, who continue to exclude the notes from admitted assets.

As I reflect on this triple play I become "curiouser and curiouser," to quote poor Alice. That's because Financial's guarantee of Group's indebtedness to Reliance Insurance smacks of pure incest, since, excepting for Commonwealth, Financial owns precious little more than Insurance. Moreover, though the Commonwealth stock is pledged by Financial for the guarantee, Provident National Corp., a bank holding company, holds a sizable interest.

Thus, the title insurance company was acquired by Financial Services from Provident in exchange for $30 million in a newly issued preferred stock calling for a 10% dividend. Provident may become entitled to as much as another $10 million worth of that preferred, based on Commonwealth's earnings over a five-year period. As a result, Provident's continuing stake in the operations of Commonwealth could be jeopardized in the event of serious trouble at Reliance Group.

But even beyond that, incidentally, for me, this Financial preferred stock is nothing but debt thinly disguised. That's because beginning Oct. 31,

*Continued on Page 18*

# Wall Street

## at the push of a button

- Stocks • Volume
- Dow • Options
- Open • Close
- Nasdaq
- High
- Tics

Stay on top of the market with the portable, computer-linked console. ■ Press a few buttons and an electronic screen displays price and other timely data on over 7,000 stocks and options. Listed stocks and options lag the tapes by only 15 minutes. ■ No installation necessary. Tax deductible. As low as $25 per month. ■ Send coupon below for full information.

### MARKETLINE

2337 Philmont Ave., Huntingdon Valley, Pa. 19006 — Phone (215) 947-6670

□ Please send me complete information.
□ Please call me to arrange demonstration.

Name_____ Co._____
Street_____ Phone_____
City_____ State_____ Zip_____
B 7   Territories open for qualified representatives

## WHOSE "DEEP POCKET"?

### Continued from Page 5

1980, Financial is required to redeem $2 million of the preferred shares held by Provident each and every year through 1994. Just as Financial will have a sinking fund commitment to redeem $5 million of its debenture bonds in each of the 10 years beginning with 1983, so it will have to fund $2 million annually from 1980 through 1994 to redeem the preferred. There may be a semantic distinction between the two; it may also be that Provident gets a tax break, since 85% of the $3 million in annual dividends received on the preferred is tax free. But when it comes to the ultimate economic realities, the distinction between such preferred stock and debt is a distinction without a difference.

Reliance Group rallied in other ways to buttress the flagging resources of Reliance Insurance. The red herring informs us a second measure involved the sale and leaseback by insurance of its furniture and office equipment to Leasco Capital Equipment Corp., a subsidiary of Reliance Group; approximately $4,200,000 received for such property was included in admitted assets of Reliance Insurance, increasing its Statutory Policyholders' Surplus by that amount. The lease in this transaction was simultaneously sold to Manufacturers Hanover Trust Co.

Act III of the Reliance Insurance "must gain weight" campaign is summarized in the prospectus this way: "Pursuant to a Factoring Agreement with First Pennsylvania Bank, N.A., dated Dec. 30, 1975 (the "Factoring Agreement"), Reliance Insurance sold on a non-recourse basis, subject to certain adjustments, approximately $1,019,000 of its accounts receivable at 90% of their face value, with the remaining 10% being held in escrow to secure collection. Provided that no default exists under the Factoring Agreement, Reliance Insurance has the right, but not the obligation, to continue to sell quarterly through 1977 to such banks up to an aggregate of $1,700,000 of its accounts receivable on similar terms and conditions. Prior to this sale such accounts receivable were not eligible to be considered Admitted Assets and, therefore, were not included in Reliance Insurance's Statutory Policyholders' Surplus. Each sale pursuant to the Factoring Agreement converts assigned accounts receivable into cash and increases Reliance Insurance Statutory Policyholders' Surplus by the net sale proceeds. . . ."

All of this is most laudable and understandable. Hopefully, these measures, coupled with rising stock and hard prices, will enable the insurance company to function in the future without artificial respiration.

But such prophylaxis in response to urgent pressures from the regulatory agencies merely serves to underscore the accounting evil of effecting a so-called "full consolidation" of the parental computer leasing complex, with the insurance operations. In the accompanying tables, I present some figures which have been derived by my "differential calculus," namely deducting

Continued on Page 20

# CREUSOT-LOIRE GROUP

Head-Office 42, rue d'Anjou - 75008 Paris

France's leading industrial group
in the special iron and steel industry and heavy engineering,
it has continued its international expansion
through the acquisition of stakes
in companies located on major world markets

### METALLURGY
- High-grade and special steels
- Alloys and super-alloys
- Metal processing (forging, casting, etc.)

### ENGINEERING AND CONTRACTING
- Energy, transport and handling equipment
- Equipment for metal production and processing
- General contracting

#### • In the U.S.
- PHOENIX STEEL (plate, seamless tubes)
- YALE STEEL (mini-mill)
- AG-MET (recycling activities, cables)

#### • In BRAZIL
- APARECIDA (melting shop, rolling mills, forging plant)

#### • In IRAN
- ISSCO (special steels)

#### • In the U.S.
- VALLEY CONSOLIDATED INDUSTRIES (assembly, metallic engineering)

#### • In BRAZIL
- MECANICA PESADA (heavy mechanics, boiler-making)

| CREUSOT-LOIRE in 1975 | FF Million |
|---|---|
| Consolidated turnover, incl-tax | 8,660 |
| Consolidated turnover, excl-tax | 8,022 |
| inclusive exports (direct and indirect) | 4,730 |
| Cash-flow | 294.4 |
| Net earnings (group's share) | 28.3 |

Paris Bourse: listed on the forward market under "Metallurgy"
• High (in Frs) 186.00 - Low (in Frs) 150.00

U.S.A.: CREUSOT-LOIRE STEEL Corp. • 475 Park Avenue South NEW YORK N.Y. • 10016

### Table I

#### THE "DIFFERENTIAL CALCULUS" WORKSHEET
(As of Dec. 31, 1975)

| | Reliance Group Consolidated | Reliance Insurance Complex | Reliance Group Excluding Insurance Complex |
|---|---|---|---|
| *Assets* | (Amounts in $ Millions) | | |
| Marketable securities common & preferred stocks (at quoted market) | 251 | 251 | 0 |
| Bonds (at amortized cost) | 553 | 553 | 0 |
| Cash | 79 | 63 | 16 |
| Accounts and Notes receivable (less allowances) | 122 | 95 | 27 |
| Finances lease receivables | 25 | 0 | 25 |
| Computer rental equipment (at cost, less accumulated depreciation) | 133 | 0 | 133 |
| Container rental equipment (at cost, less accumulated depreciation) | 85 | 0 | 85 |
| Prepaid insurance acquisition cost and other prepaid expenses | 80 | 78 | 2 |
| Policy and first mortgage loans | 41 | 41 | 0 |
| Real estate (at cost less accumulated depreciation) | 39 | 32 | 7 |
| Furniture and Fixtures, etc. (at cost less accumulated depreciation) | 20 | 0 | 20 |
| Title plants | 0 | 11 | (11) |
| Cost of businesses acquired in excess of amounts allocated to tangible assets | 9 | 0 | 9 |
| Notes receivable from Reliance Group | 0 | 138 | (138) |
| Other Assets | 60 | 56 | 4 |
| Total assets | 1497 | 1318 | 179 |
| *Liabilities* | | | |
| Unearned insurance premiums | 249 | 249 | 0 |
| Unpaid insurance losses and loss expenses | 448 | 448 | 0 |
| Future Life policy benefits | 141 | 141 | 0 |
| Notes payable | 191 | 57 | 134 |
| Limited recourse notes payable | 29 | 0 | 29 |
| Accrued expenses and accounts payable | 108 | 72 | 36 |
| Federal and foreign income taxes | 27 | 43 | (16) |
| Debentures and subordinated notes | 181 | 50 | 131 |
| Minority interests | 8 | 8 | |
| | 30* | 30* | |
| Total liabilities | 1412 | 1098 | 314 |
| Shareholders' equity | 85 | 220 | (135) |

* Represents the preferred stock issued by Reliance Financial, the subsidiary which owns the insurance complex. On the Reliance Group balance sheet, this is shown as other than shareholders' equity. Financial reflects it as part of equity. To conform the two, I have shown this as a liability for both.

1357

## Your Own Computer Terminal For Instant Information

### Now Available For The Private Investor

Now you can keep up to the minute on what's happening on stock or commodity prices, or in market statistics, with this remarkable computer terminal in your home or office It gives you instant *real time* access to listed stocks and options (NYSE, AMEX, CBOE, PBW) and a direct link to OTC prices The console provides a visual display as well as a printed tape and a wide variety of information as trends, industry groupings, averages, etc as well as prices. The console is not for sale It is available to investors by placement of commission business through a NYSE member firm

**Instant Information**
P.O. Box 332
Bowling Green Station    Details, please, on how I can get an
New York, New York 10004    Instant Information computer terminal

Name _____
Address _____
City _____ State _____ Zip _____
Phone _____

Northern Natural Gas Company Home Office, Omaha, Nebraska, Divisions and Subsidiaries. Consolidated Natural Gas Limited Alberta Canada Consolidated Pipe Lines Company Alberta Canada Western of Canada Ltd. Alberta Canada Cumberland Gathering System Limited Alberta Canada Nonands Petroleum Limited Alberta Canada Northern Liquid Fuels International Ltd Houston Texas Energy Systems Division Omaha Nebraska Hydrocarbon Transportation Inc Omaha Nebraska Northern Gas Products Company Omaha Nebraska Northern Petro Company Omaha Nebraska Northern Propane Gas Company Minneapolis Minnesota Northern Vocational Training Company Washington D.C. Peoples Natural Gas Division Omaha Nebraska Indiana Corporation Minneapolis Minnesota Dominican Republic Jamaica Guatemala Venezuela Puerto Rico United Petroleum Gas Company Minneapolis Minnesota Western Division Arkansas Texas UPG Inc Omaha Nebraska Northern Petrochemical Company Des Plaines Illinois Automotive Chemicals Division Des Plaines Illinois Carbon Division Lansing Illinois Marine Plastics Division Carson Massachusetts National Poly Products Division Mankato Minnesota

# and we also help calm the waters for Olympic swimmers.

If swimmers met fewer waves in the pool, they could make more waves in the record books And thanks to a patented design in lane markers Olympic swimmers are getting that chance
We're helping The Polymers Division of our Northern Petrochemical Company supplies the plastic used in KEIFER McNEIL S unique Competitor Racing Lanes They're designed to calm the turbulence churned up by swimmers and to maintain

ideal racing conditions
It's just one use of the wide range of products and services Northern provides as a widely diversified natural gas company
Our search for new and better energy uses has also led us into packaging color resins antifreeze and much more
By squeezing all the value we can from our energy sources we're providing a service far beyond what you'd expect from a traditional gas pipeline company

And as we continue to diversify and develop in areas where major growth is possible both our customers and investors will benefit
Meanwhile we'll still be doing all the things you'd expect a gas company to do
Like serving 1 5 million customers through 74 utilities in eight states maintaining over 31 000 miles of natural gas pipeline and continuing our constant search for new gas reserves

# Northern
The gas company that's something else

Continued from Page 18

the balance sheet numbers relating to Reliance Financial (i.e., the insurance complex) from the consolidated Reliance Group. On that basis, I came up with a $135 million deficiency in shareholders' equity (ex the insurance operations), as contrasted with the $85 million in *positive equity* shown on the consolidated statement distributed to shareholders and filed with the SEC.

This $135 million deficit was $45 million greater than that which I calculated as of the end of 1974 in my book, *More Debits Than Credits.* Here is how the arithmetic works: Group reported a consolidated loss of $27 million; since the Financial Services complex showed $15 million in net income it follows that Reliance ex-insurance dropped $42 million. That sum, plus $3 million paid as dividends, added to the 1974 deficit of $90 million, produces the $135 million deficit in shareholders'

### Table II
#### RELIANCE GROUP PRO-FORMA BALANCE SHEET EXCLUDING THE INSURANCE COMPLEX
(as of Dec 31 1975)
(amounts in $ millions)

| Assets | | Liabilities | |
|---|---|---|---|
| Cash | 16 | Notes payable | 163 |
| Accounts and notes receivables | 27 | Accounts, etc. payable | 36 |
| Finance lease receivables | 25 | Taxes | (16) |
| Computers | 133 | Debentures | 131 |
| Containers | 85 | Notes payable to Financial Services | |
| Prepaid expenses | 2 | subsidiary | 138 |
| Real estate | 7 | Total liabilities | 452 |
| Furniture, fixture | 9 | | |
| Goodwill | 9 | Deficit in equity, (excluding the insurance complex) | (133) |
| Other | 4 | | |
| Total assets | 317 | Total liabilities | 319 |

equity shown by my reconstructed balance sheet.

But even $135 million doesn't really plumb the depths of the deficit facing Reliance Group's common stockholders. Thus, Reliance now shows $116 million in redemption value of the outstanding preferred stock; but it is listed as though it's a part of shareholders' equity instead of as corporate debt. I maintain that the sinking fund and fixed redemption requirements of these preferred shares make of them nought but debentures.

If, then, we add the $116 million to the $135 million we come up with a "pocket" of about a quarter of a billion dollars. And that doesn't even factor in what I believe to be an excess in the carrying value in Leasco's computer and container leasing equipment of $40 million or more. Reliance Group's auditors, Touche Ross, when certifying the 1975 accounts, gave the company a "clean opinion" as distinguished from the qualified 1974 opinion (i.e., made "subject to the recovery of the remaining undepreciated cost of computer rental equipment"); I see nothing in the 1975 operations, nor in the data forecast by Reliance's management, to warrant the auditors' sanguine outlook at the close of '75.

To the contrary, I cannot avoid making clear my disavowal of Touche Ross's 1975 opinion. In a footnote the auditors make passing reference to their misgivings regarding the carrying value of this asset, thus: "The financial statements of Capital and Europa (the two computer-leasing subsidiaries) have been separately examined by the Company's independent accountants whose opinions are subject to the recovery of the remaining undepreciated cost of computer rental equipment. Substantially all the assets of both Capital and Europa are comprised of computer leasing equipment, and recovery of the undepreciated cost of such equipment is dependent on the companies' ability to re-lease sufficient amounts of equip-

ment at satisfactory rental rates."

Now, these are serious misgivings and Touche Ross did rightfully express its qualifications of the subsidiaries' 1975 financial statements. The question is, why did the qualification stop at that lower level and not show up in the consolidated financial statements?

It may well be that the auditors would rationalize their approach by reference to "materiality"—whatever that term might imply. And I might accept such a response on the consolidated basis if all of the resources shown by that balance sheet stood on an equal footing. But as my derived balance sheet makes abundantly clear, some resources are more equal than others. Thus, while the $133 million in computer-leasing equipment may not be material when related to the gross assets on the balance sheet of about $1.5 billion, it looms enormously when we squeeze out $1.3 billion of what I call the sequestered resources of the insurance complex. The $133 million then represents almost three-quarters of the remaining total assets.

### High Finance
Now let us next direct our attention to a series of events which occurred last fall. In the 1975 annual report, we are told: "Undoubtedly, this year's most significant development was the repayment of $93 million of Leasco Capital Equipment's direct indebtedness to 33 domestic banks. This was accomplished through two transactions involving the selling of future lease receivables under financing leases for $53 million and a $35 million limited recourse financing secured by lease rentals on computer operating leases. Proceeds from these two transactions, plus $5 million of internally generated funds, were used to prepay the bank debt.

"As a result of these moves, our maximum liability has been reduced from $93 million to $22 million in the event lessees of any equip-

# 1358

▌▌▌▌▌▌▌▌▌

ment default on their lease payments

"Moreover, since these arrangements were concluded at a fixed interest rate and do not require any compensating bank balances, about $12 million was freed for general corporate use."

Management may be entirely correct in viewing these transactions so felicitously. But what is certain is that the transaction must have pleased the bankers, who, be it remembered, have a direct line into Reliance Group and its subsidiaries through the membership on the board of directors of Reliance Group, as well as its subsidiaries, if George R Baker Jr., an executive vice president of Continental Illinois — Reliance's lead bank (and as we will see a direct party to these October 1975 transactions) . These bankers, whether they willed it or not, obtained a "favored nation" position in important assets of the leasing company.

For one thing, the banks got finance (hence, full payout) lease receivables in the amount of $63,868,000 in exchange for $53,429,000. Because Leasco was carrying these leases on its books at $57,075,000, it sustained a loss of $3,646,000. For another, the banks also got as collateral essentially all of Leasco's non-cancellable leases on the domestic company's computer portfolio for which Leasco received $34,799,900 as a new "Limited Recourse Loan." As a final note, Reliance Group was not permitted to keep any portion of that Limited Recourse Loan, nor of the proceeds from the finance lease sale. All of these funds, together with another $4,965,000 from Group, went to the banks to pay off $93 million in existing debt.

Thanks to this Tinkers to Evers to Chance play, the banks wound up with nearly $5 million of Reliance Group's money And insofar as $88 million of bank debt was concerned, the bankers are now able to look directly to the cash to be generated by the finance and operating lease receivables without these revenues first flowing through the Leasco-Reliance hopper (where they might be utilized for operating expenses and even other creditors).

### "Extraordinary Item"

· As for the accounting for the $3,646,000 loss sustained by Reliance Group on the sale of the finance leases, I find it to be highly questionable If we go back to the arithmetic, the company transferred potential collections of $63,-868,000 to Continental Illinois. It received in return $53,-429,000. This sum was not taken out of thin air, instead, as the purchase agreement makes clear, "such (amount) being calculated on a discount basis at the rate of 11¼% per

annum." Since, as noted above, Leasco was carrying these potential receivables at $57,075,000, it sustained a loss on the sale of the difference of $3,646,000.

In the accountings, this loss is included among the net "Extraordinary items" with the explanation that it resulted "from the early extinguishment of debt by a leasing subsidiary.' ' I maintain that this is flatly contradicted by the purchase agreement Thus, the leases were not swapped for the debt; instead. Continental Illinois paid the aforementioned consideration "in immediately available funds " That these funds then went to pay off debts owing to Continental, et al , is interesting but not relevant to the characterization of the loss resulting from this purchase-sale transaction;

What, then, is this loss of $3,646,000, and how did it come about? Simply stated, it means that Leasco was front-end loading its income statements over the years to the extent that it was not providing 'for a yield of at least 11¼% in the still-to-be-collected balances under the finance lease contracts.

In view of the high interest cost rates sustained by Leasco and its parent over the years (especially when compensating balances are considered), that the company and its auditors did not provide for a built-in rate of return of at least 11¼% is incomprehensible

Now, then, when the purchaser obtained the 11¼% yield, the company and its auditors endeavored to squeeze this transaction into Financial Accounting Standards Board Statement No 4, having to do with gains or losses on the extinguishment of debt. The company did not pay a premium on the debt extinguishment, it sustained a loss on the sale of the finance lease receivables And that loss was directly the consequence of the excessive income from these leases reported in prior financial statements.

In the '75 annual report to Reliance Group shareholders we find a polemic against the hidden costs of social inflation. Included in that preachment· "The property and casualty insurance industry has been hard-hit by an especially virulent form of social inflation. One source can be traced to the prevailing attitude that insurance companies have virtually unlimited resources. Some lawyers facetiously refer to the concept as the 'Deep Pocket Theory'."

Ironically, it might be that Saul Steinberg, Reliance Group's chairman and its largest single shareholder, could be deemed to be the progenitor of the "Deep Pocket Theory" for insurance companies, After all, he made no secret of the fact that a funda-

mental motive in his hot pursuit, back in 1968, of Reliance Insurance Co. (he called it the Raquel Welch pursuit because it was "so big and beautiful") was to get at Reliance's "deep pocket"—then alluded to as the insurance company's "surplus surplus." Steinberg had reckoned that sum at $125 million; there were other estimates. In any case, soon after Reliance was safely in Leasco's ambit, $50 million in dividends—an unprecedented sum —were paid upstream by the insurance company. The policyholders at Reliance Insurance may have cause for regret, since ultimately they will wind up footing the bill for the current financing — with the benefits slated not for them, but Reliance Group.

*Dr Briloff is Professor of Accountancy at the Baruch College of the City University of New York.*

---

*Applied for Listing:*
On the Big Board
Bell Canada
Buttes Gas & Oil
ELT Inc
National Mine Service
Texas Eastern Corp
On the Amex
Medfield Corp

---

## What does United recommend now for

### 25 Most Active Stocks of 1976

**Buy? Hold? Sell?**

Facts, figures, individual analysis, and appraisal of risk

| | | |
|---|---|---|
| Am Home Prods | Gulf Oil | RCA |
| ATT | ITT | Searle (GD) |
| Chrysler | Kresge | Sony |
| Citicorp | Litton | Southern Co. |
| East Kodak | Merrill-Lynch | Std Oil Cal |
| Gen Elec | Mid-So Util | Texaco |
| Gen Motors | Occid Petr | Westinghouse |
| Gulf & West | Pan Am Air | Xerox |
| | Polaroid | |

Send for this Special Report on the NYSE's 25 Most Active stocks in the 1st half of 1976, plus a 4-week Guest Subscription to United Reports

--- FILL OUT COUPON AND MAIL TODAY ---

## This entire package only $3

4 weeks of United Reports alone is a $9 value

NAME (please print)

ADDRESS

CITY        STATE        ZIP

## UNITED Business & Investment Service

210 Newbury St., Boston, Massachusetts 02116

## What does EDSON GOULD say now about

## The Stock Market? Gold? Dow 1200 or 800?

### BONUS

Ideas generated by EDSON GOULD and our other security analysts are available only in FINDINGS & FORECASTS, our uncommonly interesting advisory service If you subscribe to FINDINGS & FORECASTS through this offer, you will also receive, as a bonus, a copy of Edson Gould's MID-1976 FORECAST

You will also receive, immediately, and at no additional charge, the six Special Reports listed in the coupon below, all of which were written by Edson Gould. Each of these reports, as well as our 18 page Vital Anatomy brochure, will all be sent to you as a bonus with a three month or one year subscription to FINDINGS & FORECASTS TAX DEDUCTIBLE Subscription information appears in the coupon below

### DISCRETIONARY INVESTMENT MANAGEMENT

If you would like to receive, with absolutely no obligation, information on our discretionary investment management program for individual, pension, or profit sharing accounts of $200,000 or more, please check the last box.

## ANAMETRICS, INC.

290 PARK AVENUE NEW YORK NEW YORK 10017 PLAZA 8-5500

Please send

☐ Edson Gould's latest forecast on the stock market and gold included in the next issue of FINDINGS & FORECASTS EDSON GOULD'S six Special Reports "THE MID-1976 FORECAST", "THE 1976 FORECAST" "INDUSTRY AND STOCK FORECAST", "A MAJOR TOP", "THE LAST 100 POINTS"" and "MAJOR SALE BULLETIN", as well as 18 page Vital Anatomy brochure, all as a bonus with a three month trial subscription to FINDINGS & FORECASTS at $150 My payment is enclosed TAX DEDUCTIBLE

☐ Edson Gould's latest forecast on the stock market and gold included in the next issue of FINDINGS & FORECASTS EDSON GOULD'S six Special Reports "THE MID-1976 FORECAST", "THE 1976 FORECAST" "INDUSTRY AND STOCK FORECAST", "A MAJOR TOP", "THE LAST 100 POINTS"", and "MAJOR SALE BULLETIN" as well as 18 page Vital Anatomy brochure, all as a bonus with a one year subscription to FINDINGS & FORECASTS at $500. My payment is enclosed TAX DEDUCTIBLE

☐ Please send information on your discretionary investment management program for accounts of $200,000 or more   ☐ Individual Account   ☐ Pension or Profit Sharing

PLEASE PRINT   Name

Address

City        State        Zip

THIS SUBSCRIPTION MAY NOT BE ASSIGNED WITHOUT YOUR CONSENT

## MEMORANDUM AND ORDER ON REARGUMENT

This Court has heard reargument, as requested by plaintiff, of its Memorandum and Order dated September 14, 1977, granting summary judgment to defendants in this defamation action.

Since reargument, the Court of Appeals of this Circuit has decided *Herbert v. Lando*, 568 F.2d 974 (2d Cir. 1977). From that opinion, which analyzes in some detail most of the prior decisions relied on by this Court in its September 14, 1977 determination, it appears very clear that, as this Court previously concluded, this plaintiff will be unable at trial to prove actual malice by clear and convincing evidence. Indeed, since *Herbert*, defendants in defamation actions may not even be examined under oath before trial as to how they "formulated [their] judgments" (Slip op. at 232). If not before trial, then not at trial, since the same reasoning used in *Herbert* with respect to pre-trial testimony must in logic apply to testimony at trial.

Accordingly, the conceded subjective intentions comprised in use of the word "momentarily" (referred to by plaintiff as "the acknowledged meaning," Br. p. 2) in this litigation, yield to its objective meaning, found by this Court in its prior decision herein, and now said to have been misapprehended.

The *Herbert* decision is also noteworthy for the suggestion, found in Judge Oakes' concurring opinion, and, we think expressed for the first time in a reported Second Circuit case, that the standards for granting summary judgment are "somewhat more relaxed in constitutional libel cases" (568 F.2d fn. 24 p. 991).

In light of *Herbert*, and in view of the recent denial by the Supreme Court of *certiorari* in *Hotchner v. Castillo-Puche*, 551 F.2d 910 (2d Cir.), *cert. denied* —— U.S. ——, 98 S.Ct. 120, 54 L.Ed. 95 (1977), practical litigants may well conclude that any remedy for libel against a journalist by a public figure is now illusory.

A judicial remedy for defamation was regarded, since the earliest days of the common law, as necessary because of the "supposed tendency [of libel] to arouse angry passion, provoke revenge and thus endanger the public peace." *Regina v. Holbrook*, 4 Q.B.D. 42, 46 (1878). Are men and women of honor who happen to be public figures to right vicious slanders hereafter by resort to fisticuffs or duelling? *Naturam expellas furca, usque tamen recurret.* Horace, *Epistles* I, 10.

Probably the policy implications of this apparent trend are not of immediate concern. The Court believes that summary judgment was properly granted in this case.

On reargument, the prior determination is adhered to.

So Ordered.